LIBERTY NATIONAL INSURANCE HOLDING COMPANY, Plaintiff-Appellant,

v.

The CHARTER COMPANY, et al., Defendants-Appellees.

No. 82–7260.

United States Court of Appeals, Eleventh Circuit.

June 1, 1984.

shareholder to divest himself of his stock holdings in the issuer. None of these sections expressly authorizes such a suit. We hold that none of these sections impliedly authorizes such a suit. The district court dismissed the issuer's complaint. We affirm.

I.

A.

Between May 4 and December 22, 1981, the Charter Company, and certain of its subsidiaries[2] (Charter), purchased an aggregate of 962,400 shares of the common stock of Liberty National Insurance Holding Company (Liberty), representing approximately 5.1% of Liberty's outstanding common stock. On December 28, 1981, Charter filed a schedule 13D statement with the Securities and Exchange Commission (SEC or Commission) reporting those purchases and other information as required by law.[3] From December 22, 1981, through January 22, 1982, Charter acquired an additional 255,100 shares of Liberty stock, increasing its holdings of outstanding Liberty stock to approximately 6.5%. This additional purchase was the subject of Amendment 1 to Charter's schedule 13D.

On February 1, 1982, Liberty brought this suit against Charter in the district court alleging that Charter had embarked on an unlawful scheme to reap illicit profits by manipulating the market for Liberty stock to bring about an upward displace-

Ira L. Burleson, Ralph B. Tate, Birmingham, Ala., Shereff, Friedman, Hoffman & Goodman, Barry Lloyd Katz, Martin Nussbaum, Robert Jeffrey Jossen, New York City, for plaintiff-appellant.

Samuel H. Franklin, C. Larimore Whitaker, Hobart A. McWhorter, Jr., Birmingham, Ala., for defendants-appellees.

David A. Sirignano, S.E.C., Washington, D.C., amicus curiae S.E.C.

Before TJOFLAT and VANCE, Circuit Judges, and MORGAN, Senior Circuit Judge.

TJOFLAT, Circuit Judge:

In this securities case, we are called upon to decide whether an issuer can bring suit under sections 10(b), 13(d), and 14(d) and (e) of the Securities and Exchange Act of 1934[1] (the Exchange Act) to require a

---

**1.** We shall refer in this opinion to the following sections of the 1934 Act by their historical nomenclature. They are codified as follows:

| Securities Exchange Act of 1934 | 15 U.S.C. § 78 (1982) |
| --- | --- |
| Section 9 | § 78i |
| Section 10(b) | § 78j(b) |
| Section 13(d) | § 78m(d) |
| Section 14(d) | § 78n(d) |
| Section 14(e) | § 78n(e) |

Sections 13(d), 14(d), and 14(e) are part of the Williams Act amendments to the Exchange Act, adopted in 1968.

The text of the pertinent part of section 9 is provided *infra* at note 14. The text of section 10(b) of the Exchange Act is provided *infra* at

note 15. The text of rule 10b–5 promulgated thereunder is provided *infra* at note 16. The text of the pertinent part of section 13(d) is provided *infra* at note 8. The text of the pertinent parts of section 14(d) is provided *infra* at note 11. The text of section 14(e) is provided *infra* at note 12.

**2.** Charter Insurance Group, Inc., CIGI, Inc., Charter Security Life Insurance Company (Louisiana), Charter Security Life Insurance Company (New Jersey), and Charter Security Life Insurance Company (New York).

**3.** The filing requirements under section 13(d) are provided *infra* at note 8.

ment in the price, and "attempting to precipitate an auction for control of Liberty"[4] by use of false and misleading schedule 13D statements. Liberty alleged that Charter's conduct violated various provisions of the Exchange Act[5] and of state law[6] and sought an injunctive order requiring Charter to divest itself of all its Liberty shares and in the interim to refrain from exercising its right to vote those shares or otherwise participate as a stockholder in Liberty's affairs. Charter moved to dismiss Liberty's complaint on February 4.

On February 16, Charter filed a second amendment to its schedule 13D, which incorporated a copy of the complaint Liberty had filed in the district court and set forth Charter's position with respect to Liberty's allegations. Amendment 2 also reported Charter's acquisition of an additional 78,000 shares of Liberty stocks raising its holdings to approximately 6.9%. On March 17, 1982, Charter filed a third amendment to its schedule 13D, reporting the acquisition of an additional 188,200 shares which increased its holdings to approximately 7.9% of the total outstanding Liberty common stock. On April 27, 1982, the district court, acting on Charter's February 4 motion, dismissed Liberty's complaint with leave to amend. Liberty filed an amended complaint on May 17, 1982.

Liberty alleged in its amended complaint that Charter had pursued a widespread and pervasive scheme in violation of the Exchange Act to enrich itself at the expense of the investing public, including former and present Liberty shareholders. Charter's putative scheme was to accumulate a block of Liberty shares large enough to enable Charter either to sell the shares at a control premium or to coerce Liberty's management to give Charter business concessions to the economic detriment of Liberty shareholders. Liberty's amended complaint asserted three distinct claims for relief. Each claim sought the same injunctive relief Liberty had asked for in the original complaint: that the court order Charter to divest itself of its holdings of Liberty stock, either by rescinding its purchases or selling on the open market, and pending such divestiture to refrain from voting its shares or otherwise exercising its rights in those shares.[7]

---

4. Precisely what meaning Liberty intended to convey by the use of the word "auction" we cannot determine.

5. Liberty alleged that Charter violated sections 9, 10(b), 13(d), 14(d) and 14(e) of the Exchange Act, and SEC rule 10b–5 promulgated pursuant to section 10(b). These provisions also provided the basis for Liberty's claims against Charter in the amended complaint. *See infra* text at 3–6. Subject matter jurisdiction over this action was conferred on the district court by section 27 of the Exchange Act, 15 U.S.C. § 78aa (1982).

6. Liberty charged Charter with committing common law fraud and various other common law and statutory torts. Liberty abandoned these claims when it amended its complaint, *see infra* text at 3; they are not involved in this appeal, and will not be mentioned further. Subject matter jurisdiction over these matters was conferred on the district court by the doctrine of pendent jurisdiction.

7. Liberty specifically requested the following relief:

I. Requiring Defendants to offer to rescind the purchases or otherwise divest themselves of all shares of Liberty National stock owned by them, in an orderly manner and without prejudice to the interests of Liberty National's present shareholders or to the rights of shareholders who in the past sold shares to Defendants pursuant to their unlawful scheme;

II. Enjoining Defendants, their officers, employees and agents, and all other persons acting in concert with or on behalf of the Defendants, directly or indirectly, from:

(a) acquiring or attempting to acquire any shares of Liberty National common stock;

(b) filing or disseminating any false or misleading Schedule 13D statements or other documents related to purchases or sales of Liberty National securities by Defendants or to Defendants' intentions with respect to such purchases and sales;

(c) voting in person or by proxy any shares of Liberty National common stock;

(d) otherwise using or attempting to use any shares of Liberty National common stock as a means of controlling or affecting the management of Liberty National for the purpose of advancing the interests of the Defendants or otherwise;

(e) exercising or attempting to exercise, directly or indirectly, any influence upon the management of Liberty National for the purpose of advancing the interests of the Defendants or otherwise; or

(f) taking or attempting to take any other steps in furtherance of their unlawful

Liberty's first claim for relief was based on section 13(d)[8] of the Exchange Act.

scheme to manipulate the market for Liberty National stock or to attempt to precipitate an auction for control of Liberty National.

III. Declaring and decreeing that Liberty National is entitled to refuse to transfer on its books any stock purchased by Defendants or any of them and to refuse to recognize the vote with respect to any stock purchased by Defendants or any of them; and

IV. Granting Liberty National such other and further relief as this Court may deem just and proper.

8. Section 13(d) of the Williams Act (amendments to the Exchange Act), 15 U.S.C. § 78m(d) (1982), provides in pertinent part:

(d) Reports by persons acquiring more than five per centum of certain classes of securities

(1) Any person who, after acquiring directly or indirectly the beneficial ownership of any ... [covered security] is directly or indirectly the beneficial owner of more than 5 per centum of such class shall, within ten days after such acquisition, send to the issuer of the security at its principal executive office, by registered or certified mail, send to each exchange where the security is traded, and file with the Commission, a statement containing such of the following information, and such additional information, as the Commission may by rules and regulations, prescribe as necessary or appropriate in the public interest or for the protection of investors—

(A) the background, and identity, residence, and citizenship of, and the nature of such beneficial ownership by, such person and all other persons by whom or on whose behalf the purchases have been or are to be effected;

(B) the source and amount of the funds or other consideration used or to be used in making the purchases, and if any part of the purchase price is represented or is to be represented by funds or other consideration borrowed or otherwise obtained for the purpose of acquiring, holding, or trading such security, a description of the transaction and the names of the parties thereto, except that where a source of funds is a loan made in the ordinary course of business by a bank, as defined in section 78c(a)(6) of this title, if the person filing such statement so requests, the name of the bank shall not be made available to the public;

(C) if the purpose of the purchases or prospective purchases is to acquire control of the business of the issuer of the securities, any plans or proposals which such persons may have to liquidate such issuer, to sell its assets to or merge it with any other persons,

Liberty alleged that Charter, in carrying out its scheme to acquire a control position,

or to make any other major change in its business or corporate structure;

(D) the number of shares of such security which are beneficially owned, and the number of shares concerning which there is a right to acquire, directly or indirectly, by (i) such person, and (ii) by each associate of such person, giving the background, identity, residence, and citizenship of each such associate; and

(E) information as to any contracts, arrangements, or understandings with any person with respect to any securities of the issuer, including but not limited to transfer of any of the securities, joint ventures, loan or option arrangements, puts or calls, guaranties of loans, guaranties against loss or guaranties of profits, division of losses or profits, or the giving or withholding of proxies, naming the persons with whom such contracts, arrangements, or · understanding have been entered into, and giving the details thereof.

(2) If any material change occurs in the facts set forth in the statements to the issuer and the exchange, and in the statement filed with the Commission, an amendment shall be transmitted to the issuer and the exchange and shall be filed with the Commission, in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

\* \* \* \* \* \*

(5) The Commission, by rule or regulation or by order, may permit any person to file in lieu of the statement required by paragraph (1) of this subsection or the rules and regulations thereunder, a notice stating the name of such person, the number of shares of any equity securities subject to paragraph (1) which are owned by him, the date of their acquisition and such other information as the Commission may specify, if it appears to the Commission that such securities were acquired by such person in the ordinary course of his business and were not acquired for the purpose of and do not have the effect of changing or influencing the control of the issuer nor in connection with or as a participant in any transaction having such purpose or effect.

(6) The provisions of this subsection shall not apply to—

\* \* \* \* \* \*

(D) any acquisition or proposed acquisition of a security which the Commission, by rules or regulations or by order, shall exempt from the provisions of this subsection as not entered into for the purpose of, and not having the effect of, changing or influencing the control of the issuer or otherwise

filed false and misleading schedule 13D statements. Section 13(d) of the Exchange Act requires that anyone acquiring more than five percent of any class of equity securities of a company registered with the SEC file with the Commission, any exchanges on which the stock is traded, and the issuing company· a schedule 13D statement setting forth, among other things: (a) the background and identity of the purchaser; (b) the source of funds used to purchase the securities; and (c) the purpose of the acquisition and the purchaser's future plans and intentions with respect to the issuer. SEC rule 12(b)20, 17 C.F.R. § 240.12(b)–20 (1983), promulgated under section 13(d), requires periodic updating of schedule 13D statements to reflect changes in the facts previously disclosed. Liberty alleged that Charter's schedule 13D statement, including the amendments thereto, was false and misleading as to the identity

of the purchaser, the source of the funds, the purpose of the acquisition and the purchaser's future plans.[9]

Liberty did not allege how the false schedule 13D statement enabled Charter to acquire its shares of Liberty stock; Liberty pled no facts that indicated that Charter's 13D statement was ever communicated to the market or to the Liberty shareholders who sold to Charter.[10] Nor did Liberty allege how it was injured by Charter's 13D statement. Notwithstanding the lack of any allegation of a causal relationship between Charter's schedule 13D statement and Charter's acquisition of Liberty stock, Liberty nevertheless sought the injunctive relief stated above: that Charter be divested of its Liberty shares.

Liberty's second claim for relief was that Charter engaged in a tender offer in violation of sections 14(d)[11] and (e)[12] of the

as not comprehended within the purposes of this subsection.

**9.** The amended complaint alleged that Charter's 13D filing, as amended, was willfully false and misleading in the following respects:

It falsely stated that defendants' purchases of Liberty National shares were "primarily for investment" and did not disclose that defendants' purpose and plan was to acquire 9.9% of plaintiff's stock in order to gain an influential or dominant position in plaintiff or sell their shares at a "control" premium.

It failed to disclose that the purchases of Liberty National stock were and are part of an overall scheme to acquire positions of influence and dominance in several companies.

It failed to disclose that there were and are understandings, arrangements and agreements among the defendants with respect to, inter alia, the purchase, holding and voting of Liberty National shares.

It failed to disclose that the funds used to purchase Liberty National securities were obtained through the illegal sale of single premium deferred annuities [an insurance product for which the purchaser pays a single large premium in the present in exchange for an annuity to commence some time in the future] and are therefore subject to being rescinded or refunded.

It failed to disclose that Raymond K. Mason ("Mason") and St. Joe Paper Company ("St. Joe"), substantial shareholders of Charter, may be deemed to "control" Charter, and that the Alfred I. DuPont Testamentary Trust (the "Trust") may be deemed to "control" St. Joe.

It failed to disclose that defendants have conducted their investment activities in violation

of the insurance laws of New York and New Jersey.

It failed to disclose that the defendants have engaged in an illegal tender offer.

It failed to disclose that defendants violated the Hart-Scott-Rodino Antitrust Improvements Act of 1976 ("Hart-Scott-Rodino"), 15 U.S.C. § 18a.

**10.** Liberty alleged that the false information Charter disclosed in its schedule 13D statement was highly favorable to Charter, and thus presumably beneficial to Liberty, and if disclosed to the market would create an increased demand for Liberty stock and a consequent rise in its price; and that Charter's schedule 13D statement failed to disclose information highly damaging to Charter, and thus detrimental to Liberty if Charter gained a control position, implying that if the information were communicated to the market, it would cause a sell off of Liberty stock and a consequent fall in its price.

**11.** Section 14(d) of the Williams Act (amendments to the Exchange Act), 15 U.S.C. § 7n(d) (1982), provides in pertinent part:

(d) Tender offer by owner of more than five per centum of class of securities; exceptions

(1) It shall be unlawful for any person, ... to make a tender offer for [any registered security] if, after consummation thereof, such person would, directly or indirectly, be the beneficial owner of more than 5 per centum

Exchange Act. According to Liberty, Charter solicited and purchased large blocks of Liberty shares at a premium, and this constituted a tender offer. Section 14(d) requires that persons making a tender offer for securities disclose certain prescribed information by filing it with the SEC. This information includes all that is required in a section 13(d) filing. Section 14(e) prohibits fraudulent conduct in connection with a tender offer.

Liberty alleged that Charter failed to file the required information under section 14(d), and that Charter's false and misleading schedule 13D statement amounted to fraudulent conduct under section 14(e). Liberty did not allege how it was injured by this fraudulent conduct. Nor did Liberty

of such class, unless at the time copies of the offer or request or invitation are first published or sent or given to security holders such person has filed with the Commission a statement containing such of the information specified in section [13(d) of the Exchange Act] such additional information as the Commission may by rules and regulations prescribe as necessary or appropriate in the public interest or for the protection of investors. All requests or invitations for tenders or advertisements making a tender offer or requesting or inviting tenders of such a security shall be filed as a part of such statement and shall contain such of the information contained in such statement as the Commission may by rules and regulations prescribe....

\* \* \* \* \* \*

(4) Any solicitation or recommendation to the holders of such a security to accept or reject a tender offer or request or invitation for tenders shall be made in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

(5) Securities deposited pursuant to a tender offer or request or invitation for tenders may be withdrawn by or on behalf of the depositor at any time until the expiration of seven days after the time definitive copies of the offer or request or invitation are first published or sent or given to security holders, and at any time after sixty days from the date of the original tender offer or request or invitation, except as the Commission may otherwise prescribe by rules, regulations, or order as necessary or appropriate in the public interest or for the protection of investors.

(6) Where any person makes a tender offer, or request or invitation for tenders, for less than all the outstanding equity securities of a class, and where a greater number of securities is deposited pursuant thereto within ten days after copies of the offer or request or invitation are first published or sent or given to security holders than such person is bound or willing to take up and pay for, the securities taken up shall be taken up as nearly as may be pro rata, disregarding fractions, according to the number of securities deposited by each depositor. The provisions of this subsection shall also apply to securities deposited within ten days after notice of an increase in the consideration offered to security holders, as described in paragraph (7), is first published or sent or given to security holders.

(7) Where any person varies the terms of a tender offer or request or invitation for tenders before the expiration thereof by increasing the consideration offered to holders of such securities, such person shall pay the increased consideration to each security holder whose securities are taken up and paid for pursuant to the tender offer or request or invitation for tenders whether or not such securities have been taken up by such person before the variation of the tender offer or request or invitation.

(8) The provisions of this subsection shall not apply to any offer for, or request or invitation for tenders of, any security—

\* \* \* \* \* \*

(C) which the Commission, by rules or regulations or by order, shall exempt from the provisions of this subsection as not entered into for the purpose of, and not having the effect of, changing or influencing the control of the issuer or otherwise as not comprehended within the purposes of this subsection.

12. Section 14(e) of the Williams Act (amendments to the Exchange Act), 15 U.S.C. § 78n(e) (1982), provides:

(e) Untrue statement of material fact or omission of fact with respect to tender offer

It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation. The Commission shall, for the purposes of this subsection, by rules and regulations define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative.

allege how it was injured by Charter's failure to comply with section 14(d).[13] Liberty merely alleged that Charter, in seeking a control position in Liberty, had violated sections 14(d) and (e) and that Liberty was therefore entitled to an injunction requiring Charter to divest itself of its holdings in Liberty.

Liberty's third claim for relief was based on sections 9 [14] and 10(b) [15] of the Exchange Act and rule 10b–5 [16] promulgated by the Commission. Liberty alleged that Charter violated these laws by engaging in a scheme to manipulate the market for Liberty stock to bring about an upward displacement in the price. According to Liberty, Charter filed a false and misleading sched-

ule 13D statement and made an illegal tender offer as it pursued this scheme.

Section 9 contains, in four subsections, a variety of proscriptions against price manipulation, and creates a cause of action in favor of "any person who shall purchase or sell any security at [a manipulated price]." Liberty did not specify the provisions of section 9 that Charter supposedly violated.[17] It did allege that Charter had manipulated the market price of Liberty stock and had filed a false schedule 13D statement "for the purpose of inducing the purchase or sale of (Liberty stock) by others," thus conceivably stating a subsection (a)(2) or (4) violation. Liberty did not allege, however, how Charter manipulated the market or that its false schedule 13D state-

---

**13.** Had Charter made a section 14(d) filing, Liberty would have been permitted to file a counterstatement. Liberty did not allege that the deprivation of that opportunity injured it in any way.

**14.** Section 9 of the Exchange Act, 15 U.S.C. § 78i (1982), provides:

§ 78i. Manipulation of security prices

(a) Transactions relating to purchase or sale of security

It shall be unlawful for any person, ...

(2) To effect, ... a series of transactions in any security registered ... creating actual or apparent active trading in such security or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others.

\* \* \* \* \* \*

(4) If a ... person ... purchasing or offering to purchase the security, to make, regarding any security ... for the purpose of inducing the purchase or sale of such security, any statement which was at the time and in the light of the circumstances under which it was made, false or misleading with respect to any material fact, and which he knew or had reasonable ground to believe was so false or misleading.

\* \* \* \* \* \*

(e) Persons liable; suits at law or in equity

Any person who willfully participates in any act or transaction in violation of subsections (a), (b), or (c) of this section, shall be liable to any person who shall purchase or sell any security at a price which was affected by such act or transaction, and the person so injured may sue in law or in equity in any court of competent jurisdiction to recover the damages sustained as a result of any such act or transaction....

**15.** Section 10(b), 15 U.S.C. § 78j(b) (1982), provides in part:

It shall be unlawful ...

\* \* \* \* \* \*

(b) to use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

**16.** Rule 10b–5. Employment of Manipulative and Deceptive Devices. 17 C.F.R. § 240.10(b)–5 (1983).

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud.

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

**17.** Subsection (a) deals with six types of transactions concerning the purchase or sale of securities (section 9(a) (1 through 6)); subsections (b), (c), and (d) concern transactions relating to puts, calls, straddles, or options. Liberty's complaint contained no allegations implicating subsections (b), (c), or (d), and none implicating subsections (a)(1), (3), (5), or (6).

ment was communicated to any Liberty shareholders or induced any sales. Finally, Liberty did not allege that it was a purchaser or seller of a security authorized to bring suit under section 9; it simply concluded that because Charter had violated section 9, Liberty was entitled to an injunction requiring Charter to divest itself of all its Liberty stock.

Section 10(b) and rule 10b–5 prohibit the employment of manipulative and deceptive devices, including false statements of material facts, "in connection with the purchase and sale of any security." Liberty, again, did not allege that it was a purchaser or seller of Liberty stock in any transaction affected by Charter's alleged manipulation or false schedule 13D statement. Liberty alleged only that because Charter had engaged in such conduct Liberty was entitled to a court order requiring Charter to divest itself of all of its holdings in Liberty.

Charter moved to dismiss Liberty's amended complaint on May 27, 1982. The district court treated the motion as a motion for summary judgment under rule 12(b) of the Federal Rules of Civil Procedure because it considered, in addition to the allegations of Liberty's amended complaint, amendment 5 to Charter's 13D statement, which summarized the amended complaint, attached a copy of it as an exhibit, and set forth Charter's position with respect to the allegations therein. The court concluded that none of Liberty's three claims stated a cause of action and dismissed Liberty's complaint without prejudice.[18]

The district court dismissed the first claim on the ground that an issuer does not have standing [19] to challenge a facially sufficient schedule 13D filing. The court dismissed the second claim on the ground that Liberty had failed to allege facts from which one could reasonably conclude that Charter had made a tender offer within the meaning of section 14. The court dismissed the third claim on the ground that sections 9 and 10(b) and rule 10b–5 do not create a cause of action for someone, like Liberty, who is neither a purchaser nor a seller of a security. Liberty now appeals.[20]

18. The district court did not provide an explanation of why it dismissed Liberty's amended complaint without prejudice. "Title 28 U.S.C. § 1291 provides that the court of appeals shall have jurisdiction of appeals from all 'final decisions' of the district court. A dismissal without prejudice can be appealed as a final order." *Davis Forestry Corp. v. Smith*, 707 F.2d 1325 (11th Cir.1983). *See* 9 Moore's Federal Practice ¶¶ 110.08[1], 110.13[1] (2d ed. 1982).

19. Both the briefs and the district court opinion frame the issue of whether Liberty may bring this claim as one of standing. This is an incorrect though understandable way to characterize the question before the court. "We need not mince words when we say that the concept of 'Art. III standing' has not been defined with complete consistency by all the various cases decided by [the Supreme Court] which have discussed it." *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 102 S.Ct. 752, 760, 70 L.Ed.2d 700 (1982). The law of standing is related to and likely to be confused with the concepts of real party in interest, capacity to sue, and the existence and definition of private causes of action.

Standing may be an appropriate issue to raise when a party brings an action alleging a particular wrong, but has not been particularly victimized. The concern in a standing question is that since the plaintiff may not have been specially or substantially injured, there may be no justiciable case or controversy.

In the case before us, the issue is not standing, but rather the existence, limits, and contours of implied private rights of action under the securities laws. Liberty, as issuer, is not a member of a broad class putatively injured by Charter's alleged violations of the Exchange Act. Rather, Liberty bears a unique and substantial relationship to Charter, in that Charter's alleged misdeeds took place with respect to Liberty shares, and were designed to affect the character of Liberty. The issue we must decide is whether a cause of action exists under the Exchange Act for Liberty to have Charter divested of its holdings for its alleged misdeeds. *See generally,* 13 C. Wright, A. Miller and E. Cooper, Federal Practice and Procedure § 3531 (standing) (1975); C. Wright, Law of Federal Courts, § 13 (standing to litigate) (4th ed. 1983).

20. The Commission appears as *amicus curiae* solely on the question of whether a cause of action exists for an issuer to challenge a 13D filing. It supports Liberty's claim that section 13(d) implies the cause of action Liberty has presented. The Commission expresses no opinion on any other issue before this court.

It asks us to uphold the sufficiency of each of its claims for relief, and to remand the case to the district court for trial. Before turning to the merits of Liberty's appeal, several observations must be made to place Liberty's three claims in proper context.

### B.

Liberty alleged with respect to each claim that a variety of classes of individuals have been, are being, and will be injured by Charter's illegal actions. Members of the investing public who may have contemplated purchase of Liberty's shares have been forced to make their decision without the benefit of information to which they are legally entitled. Similarly, Liberty shareholders who may have contemplated sale of their shares have been forced to make that decision without the same legally required information. Holders of small amounts of Liberty stock have not been afforded the same opportunity to sell their shares that Charter has offered to large shareholders. Charter has caused confusion which has resulted in disruption of the market for Liberty's stock (an upward displacement in price) which presumably has been and will be injurious to those who purchased and will purchase at this higher price.[21]

Though Liberty alleges injuries to all these parties it does not bring this suit as either a class plaintiff, or a trustee, in behalf of shareholders or former shareholders, nor does it bring suit in behalf of the SEC; Liberty sues only for itself. Nonetheless, Liberty claims that Charter's violations of the securities laws, and the consequent injury to a variety of investors, entitle it to seek the extensive equitable relief mentioned above.

None of the Exchange Act provisions on which Liberty bases the claims it presents on appeal explicitly creates a right of action on behalf of an issuer, such as Liberty,

or any other private party. If Liberty has a right to bring any of these claims, it must be by judicial determination that Congress implied such a right. With this in mind we turn to an analysis of each of Liberty's three claims. We discuss Liberty's third claim first, then its first and second claims. Much of our discussion will be repetitive. While the sections of the Exchange Act implicated in this case have unique histories and purposes, they have much in common; therefore our analysis of whether Liberty has an implied right to bring suit under any of them will address many of the same questions.

### II.

Liberty's third claim for relief was based on sections 9 and 10(b) of the Exchange Act and rule 10b–5. On appeal, Liberty does not question the district court's determination that an issuer does not have an implied right of action under section 9. We focus our attention, therefore, on section 10(b) and rule 10b–5. Liberty alleged that Charter violated section 10(b) because it employed in connection with its purchase of Liberty stock a "manipulative or deceptive device" in contravention of rule 10b–5. The device was a false and misleading schedule 13D statement which, according to Liberty, contained "untrue statements of material facts." Liberty contends that, as the issuer of the stock involved in the purchase, it was entitled to an injunction requiring that Charter divest itself of its holdings of Liberty stock by either rescinding its purchases or selling on the open market, and pending that result that Charter be enjoined from voting its shares.

Liberty's claim fails on two grounds. First, Liberty did not allege that Charter's schedule 13D statement, or any of its amendments, was made *in connection with* any purchase or sale of Liberty stock.

---

**21.** Liberty also alleged, without any explanation, that it was injured by the possible early retirement of Liberty employees, whose retirement income is tied to the now inflated price of Liberty's stock. In addition, Liberty alleged an injury to Liberty shareholders occasioned by a

greater difficulty for Liberty in making corporate acquisitions, though the mechanism by which Charter's alleged wrongs create difficulty for Liberty in making acquisitions is not made clear by the pleadings.

Moreover, Liberty's factual allegations did not even permit the inference that Charter's schedule 13D statements allowed Charter to purchase Liberty stock at a price different from that which would have otherwise prevailed.

■ The precise meaning of "in connection with" is provided neither by section 10(b) nor rule 10b–5. The case law reveals that in order for this element to be satisfied there must be some causal relationship between the alleged deception and some consequent purchase or sale. Courts have spoken of this connection in terms of reliance and causation. *See, e.g., Rogen v. Ilikon Corp.*, 361 F.2d 260, 266–268 (1st Cir.1966); *List v. Fashion Park, Inc.*, 340 F.2d 457, 463 (2d Cir.1965), *cert. denied, sub nom. List v. Lerner*, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965), and authorities there cited; *Trussell v. United Underwriters, Ltd.*, 228 F.Supp. 757, 771 (D.Colo. 1964). *See generally*, L. Loss, "Fraud" and Civil Liability under the Federal Securities Law, 22–25, 56–58 (Federal Judicial Center 1983). The former Fifth Circuit spoke to the issue of reliance and causation in *Shores v. Sklar*, 647 F.2d 462 (5th Cir. 1981) (en banc), *cert. denied*, 455 U.S. 936, 103 S.Ct. 722, 74 L.Ed.2d 949 (1983).[22] The court noted that one of the traditional elements of a 10b–5 claim is that the "plaintiff must justifiably rely on [a false representation of a material fact]." *Id.* at 468. Liberty did not allege that any seller relied in any way on what Charter stated in any of its schedule 13D filings. In *Sklar* the court drew an exception to the requirement of reliance in a case where a party (the buyer) relied on the integrity of the market rather than a specific statement by the defendant. *Id.* at 471. The court went on to note, however, that its treatment of the reliance requirement did not diminish the necessity of a causal relationship between the alleged misdeeds and some aspect of a securities transaction, such as the price, or that it took place. *Id.* Liberty has made

no factual allegation that any transaction was affected in any way by Charter's allegedly false schedule 13D statement.

■ Second, there is no implied right of action in an issuer of the securities involved in a purchase made in violation of rule 10b–5 to compel the wrongdoer to rescind the transaction or otherwise divest himself of the securities he acquired. Implied private rights of action under section 10(b), for violations of rule 10b–5, have been recognized by district and circuit courts since 1946, *Kardon v. National Gypsum Co.*, 69 F.Supp. 512 (E.D.Pa.1946), and have been confirmed by the Supreme Court since 1971. *Superintendent of Insurance v. Bankers Life & Casualty Co.*, 404 U.S. 6, 13 n. 9, 92 S.Ct. 165, 169 n. 9, 30 L.Ed.2d 128 (1971), and *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 150–54, 92 S.Ct. 1456, 1470–472, 31 L.Ed.2d 741 (1972). It is settled law that one who has been defrauded in connection with the purchase or sale of securities has an implied right of action under section 10(b) and rule 10b–5 if he was a party to the purchase or sale, that is, a buyer or seller, but there is no judicial precedent for the claim Liberty has brought. Liberty contends that its claim is consistent with the congressional purpose in enacting section 10(b) and that Congress intended issuers to play a role, such as the one Liberty assumes here, as a policeman of section 10(b). Charter argues in response that Supreme Court precedent, specifically *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), forecloses such a claim. A careful reading of *Blue Chip* and the precedent it applies convinces us that the question is still open.

In *Blue Chip*, the Supreme Court considered the question of whether Congress intended that a private right of action for damages under section 10(b) be extended to persons who are not parties to a securities

---

**22.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of

the former Fifth Circuit handed down prior to October 1, 1981.

transaction, i.e., buyers or sellers.[23] The section 10(b) plaintiffs before the court were persons who claimed they would have bought the securities in question had they not been misled by the defendant. The right of an issuer to bring suit was not involved. The *Blue Chip* plaintiffs were former retailers of the Blue Chip Trading Stamp Company who had been deceived by an overly pessimistic prospectus and dissuaded from purchasing shares in the company pursuant to an antitrust consent decree in which they had been given first rights of purchase of what was intended to be, and was, a bargain. The stock later went up in value and they sought to recover damages for the rise in value of the shares they claimed they would have purchased but for the deceptively pessimistic prospectus.

To determine whether section 10(b) accorded putative buyers a right of action for damages, the Supreme Court construed the intent of Congress in enacting section 10(b). The Court used three tools of construction: textual analysis, legislative history and policy considerations. Section 10(b) and rule 10b–5 both use the expression "in connection with the purchase or sale of any security." The Court pointed out that both at the time of enactment and subsequently in considering amendments Congress declined to amend the language of section 10(b) to permit a wider class of plaintiffs, implying that it was clearly aware of and fully intended the narrow reading of the term "purchase and sale." *Id.* at 732–3 & n. 5, 750 n. 13, 95 S.Ct. at 1924 & n. 5, 1932 n. 13. Congress also showed itself to be willing and able to provide a remedy to a non-purchaser-seller, and to an issuer in particular, when it chose to do so. Section 16(b) of the Exchange Act, 15 U.S.C. § 78p(b) (1982), for example, provides a cause of action on behalf of issuers to recover profits from transactions

in the security of the issuer by certain insiders. *Id.* at 731, 95 S.Ct. at 1923. Thus it cannot be argued that the absence of an express cause of action was a mere oversight or error.

Justice Rehnquist, speaking for the Court, did not limit his rationale to statutory language and legislative history. Noting that "[w]hen we deal with private actions under Rule 10b–5 we deal with a judicial oak which has grown from little more than a legislative acorn" and that "[s]uch growth may be quite consistent with the congressional enactment and with the role of the federal judiciary in interpreting it," *id.* at 737, 95 S.Ct. at 1926, the Justice then turned his attention to policy considerations, in order to aid the Court in determining whether implying a cause of action on behalf of the *Blue Chip* plaintiffs was "consistent" with the purpose of Congress. *Id.*

The Court's overriding concern was that under section 10(b) and rule 10b–5 there are extensive opportunities for "vexatious" litigation of highly speculative claims. *Id.* at 739–49, 95 S.Ct. at 1927–32. The Court pointed out that

> While the damages suffered by purchasers and sellers pursuing a § 10(b) cause of action may on occasion be difficult to ascertain, in the main such purchasers and sellers at least seek to base recovery on a demonstrable number of shares traded. In contrast, a putative plaintiff, who neither purchases nor sells securities but sues instead for intangible economic injury such as loss of a noncontractual opportunity to buy or sell, is more likely to be seeking a largely conjectural and speculative recovery in which the number of shares involved will depend on the plaintiff's subjective hypothesis.

**23.** The Court was actually considering the widely followed *"Birnbaum* rule" which had its roots in *Birnbaum v. Newport Steel Corp.,* 193 F.2d 461, 464 (2d Cir.), *cert. denied,* 343 U.S. 956, 71 S.Ct. 1051, 96 L.Ed. 1356 (1952), decided 23 years earlier. That rule, as the Supreme Court viewed it, precluded non-purchasers and non-

sellers from suing for money damages under section 10(b) and rule 10b–5. *See infra* note 26. *Birnbaum* was actually an action in equity; however, most courts that applied it did so in the context of damages actions. *See, e.g., Haberman v. Murchison,* 468 F.2d 1305 (2d Cir. 1972).

*Id.* at 734–35, 95 S.Ct. at 1925 (citations omitted). For example, a putative purchaser would hypothesize the number of shares he would have purchased, the date purchased and the price paid, how long he would have held them and the profit he would have made. Operating with perfect hindsight, he would obviously assert that he would have sold his stock at its peak price. Such testimony would have questionable, if any, probative value. Nonetheless, as the court pointed out, it would have some "settlement value to the plaintiff out of any proportion to [his] prospect of success at trial so long as he may prevent [his] suit from being resolved against him by dismissal or summary judgment." [24] *Id.* at 740, 95 S.Ct. at 1927. These policy considerations would not require the dismissal of a suit for injunctive relief, however, since a plaintiff seeking an injunction is quite often successful precisely because he cannot calculate the damages he suffers.

In summary, the policy considerations underpinning *Blue Chip*'s rationale do not extend to the suit which Liberty has brought.[25] Given this point and the fact that *Blue Chip* involved putative purchasers of securities and not an issuer such as Liberty, we conclude that *Blue Chip* does not answer the question of whether Liberty has the right to bring the claim it presents.[26] We therefore must turn elsewhere to determine whether section 10(b) implies a private right of action in an issuer to seek the extensive relief sought by Liberty in this case.[27]

**24.** It is arguable that a plaintiff whose damages claim is so speculative that he cannot prove it by a preponderance of the evidence could withstand a motion for summary judgment on the ground that he would be entitled at least to nominal damages at the hands of the jury at trial, plus costs. Conceivably, even a claim for nominal damages, and costs, has a settlement value.

**25.** *Blue Chip* was a 6–3 decision. Three of the justices in the majority concurred separately. Justice Powell, writing for Justices Stewart and Marshall as well, limited his rationale to the textual foundation and legislative history of section 10(b), rather than policy considerations. 421 U.S. at 755–61, 95 S.Ct. at 1935–37 (Powell J. concurring) ("In my view, the answer is plainly compelled by the language as well as the legislative history of the 1933 and 1934 Acts"), *id.* at 760, 95 S.Ct. at 1937. There is nothing in the text and history that can be used to distinguish intelligibly between legal and equitable actions under section 10(b); thus it is arguable that these Justices would reject the cause of action Liberty seeks to maintain.

**26.** The *Birnbaum* holding, *supra* note 23, which the *Blue Chip* Court approved in a damages action context, would mandate that Liberty's claim for injunctive relief be denied on the ground that such a claim cannot be implied under section 10(b). *Birnbaum,* like the instant case, was a suit in equity, though this is not apparent from the court of appeals' opinion. The parties bringing suit were stockholders of Newport Steel who believed they were defrauded by the sale of 40% of the outstanding shares of Newport by C. Russell Feldmann to the Wilport Company. The plaintiffs claimed that since the fraud took place in connection with the sale of securities, they were entitled to sue under section 10(b). The district court opinion makes clear that the shareholders brought suit both as class representatives and in a shareholder derivative action, seeking *equitable* relief. They specifically sought *rescission* of the sale by Feldmann to Wilport, and an accounting by the defendants. *Birnbaum v. Newport Steel Corp.,* 98 F.Supp. 506 (S.D.N.Y.1951).

The court of appeals held that since the plaintiffs did not allege that they had either purchased or sold securities as a result of this fraud no cause of action existed on their behalf. The court's decision did not appear to turn on the nature of the relief plaintiffs requested. Rather, it simply construed the statute as requiring that those bringing suit be purchasers or sellers of the security. If *Birnbaum* were binding on this panel it would mandate our dismissal of Liberty's section 10(b) claim for injunctive relief.

**27.** Other courts addressing the question of whether a cause of action exists for a non-purchaser-seller under section 10(b) for injunctive relief have come down on each side of this issue. *See, e.g., Initio, Inc. v. Hesse,* 474 F.Supp. 312 (D.Del.1979) (nonpurchaser or seller has no standing to seek injunctive relief under section 10(b); *Standard Metals Corp. v. Tomlin,* 503 F.Supp. 586 (S.D.N.Y.1980) (same); *GAF Corp. v. Milstein,* 453 F.2d 709, 722 (2d Cir.1971), *cert. denied,* 406 U.S. 910, 92 S.Ct. 1610, 31 L.Ed.2d 821 (1972) (issuer does not have standing under section 10(b)); *contra Tully v. Mott Supermarkets, Inc.,* 540 F.2d 187, 194–95 (3d Cir.1976) (dictum); *Kahan v. Rosenstiel,* 424 F.2d 161, 170–73 (3d Cir.), *cert. denied, sub nom., Glen Alden Corp. v. Kahan,* 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290 (1970). We find, however, no binding precedent in this circuit.

Eight days after *Blue Chip* the Supreme Court decided *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). *Cort v. Ash* provided a test for

determining whether a private remedy is implicit in a statute not expressly providing one, .... First, is the plaintiff "one of the class for whose *especial* benefit the statute was enacted,"—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

*Id.* at 78, 95 S.Ct. at 2088 (citations omitted).

The *Cort* standard is more chary of creating private rights of action than was its predecessor, the *Borak* standard. *J.I. Case Co. v. Borak,* 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). Under *Borak* it was "the duty of the courts to be alert to provide such remedies as are necessary to make effective the congressional purpose." *Id.* at 433, 84 S.Ct. at 1560. The full meaning of *Cort* has been clarified by more recent Supreme Court pronouncements. The Court has now informed us that the central inquiry under *Cort* is congressional intent, *Touche Ross & Co. v. Redington,* 442 U.S. 560, 575, 99 S.Ct. 2479, 2489, 61 L.Ed.2d 82 (1979); *Transamerica Advisors, Inc. v. Lewis,* 444 U.S. 11, 15–16, 100 S.Ct. 242, 245, 62 L.Ed.2d 146 (1979), and that where an examination of one of the constituent *Cort* criteria unequivocally reveals congressional intent "there is no need for us to 'trudge through all four of the factors.'" *Merrill Lynch, Pierce, Fenner & Smith v. Curran,* 456 U.S. 353, 388, 102 S.Ct. 1825, 1844, 72 L.Ed.2d 182 (1982).

Following the guidance of *Cort* we shall attempt to determine whether there exists an implied cause of action under section 10(b) for *this plaintiff* to seek *this remedy.* We shall begin with the fourth prong of the *Cort* test, because though a relevant consideration, it is least likely to be dispositive. Although section 10(b) and rule 10b–5 are meant to address many of the same fraudulent activities covered by state fraud law, nonetheless, as our discussion of *Sklar* makes clear, they are intended to cover a broader class of wrongs within the confined area of securities transactions. Therefore, it is not inappropriate to create a cause of action based on federal law. This result is merely the absence of a negative inference to be drawn from state law and not a positive·argument in favor of implying a private right of action under section 10(b).

■ The first prong of *Cort* asks whether this plaintiff is "one of the class for whose *especial* benefit the statute was enacted." In *Bankers Life,* the first Supreme Court case to find an implied private right of action under section 10(b), the Court referred approvingly to the discussion of the purposes of the legislation in *Hooper v. Mountain States Securities Corp.,* 282 F.2d 195 (5th Cir.1960). 404 U.S. at 10–11, 92 S.Ct. at 168. In *Hooper* the Court stated that "obviously those sought to be protected were the very persons who would be engaged in buying and selling and trading in corporate securities as broadly defined in the [Exchange] Act." 282 F.2d at 202. More recently, the Supreme Court has informed us that the Exchange Act was designed "to protect *investors* against fraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 195, 96 S.Ct. 1375, 1382, 47 L.Ed.2d 668 (1976) (emphasis added). See H.R.Rep. No. 85, 73d Cong., 1st Sess. 1–5 (1933). From this we can conclude that the issuer qua issuer is not a party for whose especial benefit this section was enacted.

The second *Cort* criterion is whether there is "any indication of legislative intent to create such a remedy." Though Congress did not explicitly state that it did not wish to create the cause of action that

Liberty seeks to bring, there are two reasons for concluding that the creation of such a cause of action was not Congress' intent. First, as *Blue Chip* makes clear, Congress rejected the opportunity to amend the language of section 10(b) to permit a wider class of plaintiffs. Second, section 16(b) of the Exchange Act, 15 U.S.C. § 78p(b) (1982), creates a cause of action on behalf of the issuer to recover profits from the trading of certain insiders. This demonstrates that Congress, when it chose to do so, knew how to create an issuer cause of action. We conclude that the language and legislative history of section 10(b), and its textual context, counsel against any finding of a congressional intent to imply a private right of action in favor of an issuer against a shareholder to require the shareholder to divest himself of the issuer's shares.

The third prong of *Cort* asks whether this remedy for this plaintiff is consistent with the legislative scheme. The purpose of section 10(b) is "to promote ethical standards for honesty and fair dealing," *Hochfelder*, 425 U.S. at 195, 96 S.Ct. at 1382, and to "instill confidence in the securities markets by penalizing unfair dealings." *Sargent v. Genesco, Inc.*, 492 F.2d 750, 760 (5th Cir.1974). Liberty argues that, as the issuer concerned with the integrity of the market for its securities, it is best positioned to police section 10(b) and effectuate its purposes. We cannot agree.

A little knowledge of the delicate nature of the market for corporate control convinces us that there is no sound reason to provide an additional shield—in the form of the shareholder divestiture action Liberty presents—with which entrenched management can fend off hostile takeover attempts. Further, as this case illustrates, the remedy sought by management is all too likely not to serve the shareholders' interests.[28] When a party purchases stock on the market, it has the effect of raising the price; when a party sells stock, it lowers the price. Were the district court to order Charter to divest itself of Liberty's stock, it would have the effect of lowering the market value of the shares of all Liberty stockholders.[29] Moreover, the removal of voting power from Charter for its shares pending the divestiture might significantly change the balance of power among the remaining shareholders. At the same time incumbent management would likely gain from such a shift because a significant, presumably hostile force would have been removed from the equation. Finally, a divestiture order would serve to remove power from an outside force whose interest is to monitor inside management—on behalf of itself to be sure, but nonetheless serving shareholders' interests. We conclude that it could not have been Congress' intention to imply such a right of action. We therefore affirm the district court in its dismissal of Liberty's claim under section 10(b) and rule 10b–5.

### III.

 As our discussion of Liberty's section 10(b)-rule 10b–5 claim illustrates, the gravamen of all of Liberty's claims is that Charter filed a false [30] and misleading

---

**28.** Section 16(b) which we referred to in our discussion of the second prong of *Cort* is also informative for our inquiry under the third prong. Section 16(b) makes specific provision for a derivative action by shareholders on behalf of the corporation, when management is unwilling to bring a section 16(b) action. Normally, it is management who decides whether an issuer shall bring suit. Congress was fully aware, as we must be, that the interests of management and the shareholders of the firm are not identical. The issuer, as represented by management, is not an unselfish observer of the transactions in its stock. Management is therefore a most unsuitable policeman of section 10(b).

**29.** This would be true whether Charter were forced to rescind its purchases or simply dump its shares on the market. In the former case the shock to the market would simply occur one step later. The former Liberty shareholders who sold to Charter showed themselves unwilling to hold Liberty shares at the low price Charter paid; therefore, at the higher price that now prevails, they would be expected to be even more unwilling to hold shares of Liberty.

**30.** We note that in moving from the original complaint to the amended complaint, Liberty changed its allegations. In the original complaint Liberty stated that Charter's assertion that

schedule 13D statement.[31] The question we must now address, in assessing Liberty's first claim for relief, is whether an issuer has an implied right of action under section 13(d) of the Exchange Act for injunctive relief to expel an unwanted shareholder from the company.[32]

The determination of the existence of and limits on implied private rights of action is, as we have indicated in part II, *supra*, a question of statutory construction. We have no Supreme Court prece-

dent that comes to grips with the existence of and limits on implied private rights of action under section 13(d).[33] Both parties cite *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975), as having done so, and as supporting their respective positions. A careful reading of that decision, however, reveals that it is not dispositive of the issue before us.

In *Rondeau*, the Supreme Court addressed a section 13(d) claim brought by an issuer against a stockholder who had failed

it may at some future time decide to attempt to take over Liberty was false in that Charter had neither the intention nor capability of controlling Liberty. In the amended complaint, on the other hand, Liberty alleged that Charter had a definite plan to control Liberty.

**31.** Charter, in response, argues *inter alia* that Liberty's claims are moot because Charter has filed amendments to its schedule 13D which relate and reproduce all of Liberty's charges. This case is not moot for two reasons. First, Liberty does not seek a court order requiring Charter to amend its schedule 13D statement; rather, it seeks an order requiring Charter to divest itself of all of its Liberty stock and enjoining Charter from "acquiring or attempting to acquire any shares of Liberty." *See supra* note 7. Therefore, even if Charter has voluntarily amended its schedule 13D statement, a concrete controversy still remains whether Charter should be subjected to the injunction Liberty demands. Second, Liberty may seek money damages under its prayer for "such other and further relief as this Court may deem just and proper." *See supra* notes 7 and 24.

**32.** Liberty does not allege with any specificity how anyone, and *a fortiori* how Liberty, was injured by Charter's allegedly false schedule 13D statements. Yet Liberty seeks to have Charter divested of all its holdings of Liberty stock. Traditional equity principles are that the remedy should be no broader than that necessary to right the wrong. Therefore, though courts are more willing to imply the existence of an equitable remedy than damages, *see, e.g., Mobil Corp. v. Marathon Oil Co.*, 669 F.2d 366, 370–73 (6th Cir.1981); *Farmland Indus. Inc. v. Kansas-Nebraska Natural Gas Co.*, 349 F.Supp. 670, 679 (D.Neb.1972), nonetheless equity will not permit the application of a remedy that goes further than is necessary to right the alleged wrong, or protect the asserted right. *See, National Women's Health Network v. A.H. Robbins Co.*, 545 F.Supp. 1177 (D.Mass.1982). In addition, the traditional equitable prerequisites are still required under the Williams Act, e.g. irreparable harm. *Rondeau, infra*, 422 U.S. at 61, 95 S.Ct. at 2077. Therefore, even if Liberty is found to

have a right of action for injunctive relief under section 13(d), the relief would have to be limited to the harm done.

**33.** Although there is legal precedent in the former Fifth Circuit for finding the existence of an implied cause of action on behalf of the issuer to seek injunctive relief under section 13(d), we are not bound to adhere to it: in fact, intervening Supreme Court precedent mandates that we reexamine the question. In *Susquehanna Corp. v. Pan American Sulphur Co.*, 423 F.2d 1075 (5th Cir.1970), a case similar to this one, the court reached the merits, and from that one might conclude that it found that the issuer had a cause of action. Such a conclusion may be unwarranted.

The court in *Susquehanna* was faced with an appeal from a temporary injunction issued by the district court against the defendant Susquehanna. Pan American was joined in its suit by two of its stockholders. In reviewing the issuance of a temporary injunction, the court seeks the easiest question to focus on that permits it to resolve the appeal. Had the court addressed the question of whether a cause of action existed on behalf of the issuer, and found that it did not, it would still have had to address the merits of the claim since the claim brought by two stockholders would have remained before the court. The court avoided this problem when it went directly to the merits and determined that the district court finding was clearly erroneous. The court not only vacated the injunction, but dismissed the suit and stated, "[t]arget companies must not be provided the opportunity to use the future plans provision [of schedule 13D] as a tool for dilatory litigation." 423 F.2d at 1086.

Even if we were to accept *arguendo* that *Susquehanna* implicitly found the existence of a cause of action on behalf of the issuer to seek injunctive relief, *Susquehanna* was written in the spirit of *J.I. Case Co. v. Borak*, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). *See infra* text at 40. We must address the issue in the more restrictive atmosphere of more recent Supreme Court precedent cited in the text.

to make a timely section 13(d) filing. The issuer requested the same injunctive relief that Liberty requests. The Supreme Court found that the issuer had failed to show the irreparable harm which was necessary for an injunction and upheld the district court's denial of such relief. Though it might be argued that by reaching the question of irreparable injury the Court implicitly found the existence of a right of action in the issuer, such a conclusion is foreclosed by the Court's opinion; it observed that the question of the issuer's right to bring the suit had not been raised. *Id.* at 62, 95 S.Ct. at 2078. The Court did proceed, however, to voice some skepticism concerning the notion that Congress intended that section 13(d) should be used by an issuer to obtain the expulsion of a shareholder: "Congress expressly disclaimed an intention to provide a weapon for management to discourage takeover bids or prevent large accumulations of stock which would create the potential for such attempts." *Id.* at 58, 95 S.Ct. at 2076. This language is, of course, dicta; the question still remains whether Congress intended that an issuer have a cause of action under section 13(d) to seek the relief that Liberty requests.

█ Once again, it is incumbent on us to conduct the four-part inquiry of *Cort v. Ash,* and its progeny: (1) whether the plaintiff is a member of a class for whose especial benefit the statute was enacted; (2) whether there is any explicit or implicit indication of congressional intent to create or deny *this* private remedy for *this* plaintiff; (3) whether this private remedy for this plaintiff would be consistent with the underlying purpose of the legislative scheme; and (4) whether the cause of action is one traditionally relegated to state law, so that it would be inappropriate to infer a cause of action based solely on federal law. Once more we begin with the

fourth prong, because though it is a relevant consideration, it is least likely to be dispositive. Applying that prong, it is obvious that since the obligations imposed on investors under section 13(d) are exclusive to federal law, it is not inappropriate to create a cause of action based on federal law. This result is merely the absence of a negative inference to be drawn from state law and not a positive argument in favor of implying a private right of action.

Under *Cort*'s first prong we note that Liberty is a corporation, and that corporations as such are not the intended beneficiaries of section 13(d). Rather, as the Supreme Court recognized in *Piper v. Chris-Craft Industries, Inc., infra,* 430 U.S. 1, 35, 97 S.Ct. 926, 946, 51 L.Ed.2d 124 (1977), the legislative history of the Williams Act, of which section 13(d) is a part, makes clear that its sole purpose was the protection of present and potential investors. *See,* H.R. Rep. No. 1711, 90th Cong., 2d Sess., reprinted in 1968 U.S.Code Cong. & Ad.News 2811, 2813; S.Rep. No. 550, 90th Cong. 1st Sess., 3 (1967).

The second prong of *Cort* asks whether there is any evidence of legislative intent to create or deny the remedy Liberty seeks in this case. The Supreme Court in *Merrill Lynch, Pierce, Fenner & Smith v. Curran,* 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982), recently provided us with a tool for discerning congressional intent. *Curran* placed a gloss on the *Cort v. Ash* inquiry. *Curran* holds that the fact that Congress has conducted a "comprehensive reexamination and significant amendment of [a statute and] left intact the statutory provisions under which the federal courts had [routinely and consistently][34] implied a cause of action is itself *evidence* that Congress affirmatively intended to preserve that remedy." 456 U.S. at 381–82, 102 S.Ct. at 1841 (footnote omitted, emphasis added).[35] This evidence is

---

**34.** *See* 456 U.S. at 378, 102 S.Ct. at 1839.

**35.** *Curran* commands that we assume that Congress is aware of the state of the law. It is less than obvious to us, however, what level of insight we are to assume is present in the collective and aggregate minds of our legislators as they meet in Congress. Are we to assume: that they only know the holdings and perhaps the rationales, or that they understand that implying the existence and limits of a private right of

not dispositive of congressional intent. It is merely indicative of that intent.[36] With this in mind we examine the legislative and judicial history with respect to section 13(d).

The Williams Act, of which section 13(d) is a part, was enacted into law by Congress in 1968. Section 13(d) has been amended twice since, in 1970 and in 1977. Therefore we must examine the state of the law and the nature of the amendments both in 1970 and again in 1977, with respect to the existence under that section of an implied cause of action on behalf of an issuer seeking to divest a stockholder of his shares.

In *Curran* the Supreme Court was attempting to determine congressional understanding of the state of judicial interpretation of the Commodity Exchange Act which had been in force for fifty-three years at the time of the enactment of its amendment. In contrast, the Williams Act had been in force for only two years at the time of the 1970 amendment. We do not believe that any pattern of judicial interpretation that would rise to the level of being "rou-

tine and consistent" could possibly have existed with respect to the 1970 amendment of the Williams Act; two years is simply an insufficient passage of time. With respect to the 1977 amendment it is a different matter. Liberty, and the Commission, as amicus curiae, cite to us a plethora of cases all finding an implied right of action in the issuer prior to 1977.[37] This serves to establish the routine and consistent character of finding an implied right of action for issuers under section 13(d). That most of these cases merely assume a cause of action on behalf of the issuer rather than decide that one exists speaks even more strongly to the routine and consistent quality of this principle. Therefore, if Congress, presumably knowing of this judicial treatment of section 13(d), addressed the issuer's right of action in the course of revising and amending the statute, and left untouched that portion in which the courts had discerned a private right of action in the issuer, we would have strong evidence of congressional intent.

A critical examination of the legislative history of the 1977 amendments does not,

---

action is a judicial practice which, like virtually all other judicial practices, floats on a sea of fluid judicial precedent that may shift with the tides. By way of illustration, we note that prior to 1977 all courts that addressed the question found the existence of a cause of action on behalf of an issuer to seek injunctive relief under section 13(d); recently, however, a number of district courts in addition to the one whose judgment we now review have found no cause of action for the issuer. *See, Leff v. CIP Corporation,* 540 F.Supp. 857 (S.D.Ohio 1982); *First Alabama Bancshares, Inc. v. Lowder,* [1981] Fed. Sec.L.Rep. (CCH) ¶ 98,015 (N.D.Ala.1981); *American Bakeries Co. v. Pro-Met Trading Co.,* [1981] Fed.Sec.L.Rep. (CCH) ¶ 97,925 (N.D.Ill. 1981); *SZRL Investment v. U.S. Realty Investment,* C81–327 (N.D.Ohio 1981); *Gateway Indus. Inc. v. Agency Rent-A-Car, Inc.,* 495 F.Supp. 92 (N.D.Ill.) *appeal dism. per stipulation,* No. 80–1871 (7th Cir.1980); *Sta-Rite Industries, Inc. v. Nortek, Inc.,* 494 F.Supp. 358 (E.D.Wis.1980). Thus, a truly wise Congress might be expected to infer from past judicial practice that the judiciary may find and lose private rights of action, always applying its best judgment, and that such implied rights of action are not carved in stone. In fact, it has been suggested that Congress, fully knowledgeable of the workings of the judicial system, has "tended to rely to a large extent on the courts to decide whether

there should be a private right of action, rather than determining these questions for itself." *Cannon v. University of Chicago,* 441 U.S. 677, 718, 99 S.Ct. 1946, 1968, 60 L.Ed.2d 560 (1979) (Rehnquist, J., concurring) (emphasis deleted). Thus, if Congress considered the question in 1977 when it amended the Williams Act, it is arguable that the state of the law they saw was one in which the courts had used and would continue to use their judgment to determine whether and under what circumstances there was an implied private right of action under section 13(d).

36. The *Curran* court also found evidence in the legislative history that it was the intent of Congress to preserve a private right of action under the statute.

37. *See e.g., GAF Corp. v. Milstein,* 453 F.2d 709 (2d Cir.1971), *cert. denied* 406 U.S. 910, 92 S.Ct. 1610, 31 L.Ed.2d 821 (1972); *General Aircraft Corp. v. Lampert,* 556 F.2d 90, 94 n. 5 (1st Cir.1977); *Missouri Portland Cement Co. v. H.K. Porter Co.,* 535 F.2d 388 (8th Cir.1976); *Stecher-Traung-Schmidt Corp. v. Self,* 529 F.2d 567 (2d Cir.1976); *Corenco Corp. v. Schiavone & Sons, Inc.,* 488 F.2d 207 (2d Cir.1973); *Bath Industries, Inc. v. Blot,* 427 F.2d 97 (7th Cir.1970); *Susquehanna Corp. v. Pan American Sulphur Co.,* 423 F.2d 1075 (5th Cir.1970).

however, permit an unambiguous inference of legislative intent to preserve a judicially recognized issuer right of action. The matters addressed by the framers of those amendments were far removed from the question we now face. The 1977 amendments are contained in Title 2 of the "Domestic and Foreign Investment Improved Disclosure Act of 1977." Pub.L. 95–213, 91 Stat. 1498 (amending 15 U.S.C. § 78m, 78o) (1977). The framers of this legislation were primarily concerned with the ownership of American corporations by foreigners.[38] It was in response to this concern, and particularly the increased ownership by oil-rich Arabs, that an amendment to section 13(d) was enacted requiring the disclosure of the residence and citizenship of those filing a schedule 13D statement. An amendment with such a limited focus, lacking the "comprehensive" quality of the amendments to the Commodity Exchange Act examined in *Curran*, 456 U.S. at 378, 102 S.Ct. at 1839, is too narrow a base on which confidently to erect an adoption by Congress of a judicially discovered implied issuer right of action for an injunction to compel a stockholder to divest himself of the issuer's stock.[39] Therefore, while we do not reject the proposition that this failure to amend the relevant portion of the statute is *evidence* of congressional intent, we are loath to consider it dispositive of the issue.

There are a variety of other reasons, however, for concluding that Congress could not have intended that an issuer have the right to such injunctive relief. The first is provided by *Touche Ross & Co. v. Redington*, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979). There the Supreme Court construed an Exchange Act reporting provision analogous to section 13(d), section 17(a) which required members of national securities exchanges to file such financial reports as the Commission prescribed by rule. 15 U.S.C. § 78q(a) (1970 ed.). In that case, the trustee of an insolvent broker, a member of the New York Stock Exchange, sued Touche Ross & Co., a certified public accountant, for preparing and filing with the SEC an inadequate financial statement of the broker's condition. The trustee alleged that the statement failed to disclose that the broker was on the brink of bankruptcy and that had Touche Ross reported its true condition the broker's customers could have avoided the losses they incurred when the broker eventually failed. Though section 17(a) did not provide a right of action in anyone, the trustee contended that he had an implied right of action in behalf of the customers, for whose ultimate benefit the statute had been enacted.

The district court dismissed the suit, holding that no private right of action could be implied from section 17(a). *Redington v. Touche Ross & Co.*, 428 F.Supp. 483

---

**38.** S. 425 was a predecessor to S. 305, the actual bill passed. One section of S. 425 which was not adopted would have amended section 13(f) of the Exchange Act to prohibit foreign investors from acquiring more than 5% of an issuer's shares without giving prior notification, and would have given substantive authority to the President of the United States to prohibit such potential acquisitions. S. 425, 94th Cong., 1st Sess. (1975).

**39.** In his dissenting opinion, Judge Vance cites *Herman & MacLean v. Huddleston*, 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983), *infra* dissent at 571 of 734 F.2d, as support for his alternative view of how *Curran* applies to the case *sub judice*. In *Huddleston* the Court, relying on *Curran*, held that "Congress' decision [in 1975] to leave Section 10(b) intact suggests that Congress ratified the cumulative nature of the

Section 10(b) action." 103 S.Ct. at 689. *Huddleston*, however, more properly supports the proposition that the inference to be drawn from Congressional inaction on an issue is proportional to the comprehensiveness of the amendments that Congress enacted. In *Huddleston*, the Court referred to the 1975 amendments as not only "comprehensive[ ]" but as the "'most substantial and significant revision of this country's federal securities laws since the passage of the Securities Exchange Act in 1934.'" *Id.* Thus it seems clear that the High Court did not intend *Curran* to be applied mechanically but rather as a tool to be used to divine the actual intent of Congress. In that sense it seems reasonable that we should not find that every minor congressional amendment of a statute is an act of adoption of judicially discovered implied causes of action under that statute.

(S.D.N.Y.1977). The court of appeals reversed. It observed that a broker's customers were "favored wards" of section 17(a) and that Congress could not have meant them to go without a remedy to protect their interests. *Redington v. Touche Ross & Co.*, 592 F.2d 617, 623 (2d Cir.1978). The Supreme Court disagreed. In an analysis which we think is plainly applicable to the case at hand, the Court concluded that Congress could not have intended that a statute which neither conferred rights on a private party nor proscribed any conduct as unlawful provided a private right of action.

The Court concluded that

The intent of § 17(a) is evident from its face. Section 17(a) is like provisions in countless other statutes that simply require certain regulated businesses to keep records and file periodic reports to enable the relevant governmental authorities to perform their regulatory functions. The reports and records provide the regulatory authorities with the necessary information to oversee compliance with and enforce the various statutes and regulations with which they are concerned. In this case, the § 17(a) reports, along with inspections and other information, enable the Commission and the Exchange to ensure compliance with the "net capital rule," the principal regulatory tool by which the Commission and the Exchange monitor the financial health of brokerage firms and protect customers from the risks involved in leaving their cash and securities with broker-dealers. The information contained in the § 17(a) reports is intended to provide the Commission, the Exchange, and other authorities with a sufficiently early warning to enable them to take appropriate action to protect investors before the financial collapse of the particular broker-dealer involved. But § 17(a) does not by any stretch of its language purport to confer private damages rights or, indeed, any remedy in the event the regulatory authorities are unsuccessful in achieving their objectives and the broker becomes insolvent before

corrective steps can be taken. By its terms, § 17(a) is forward-looking, not retrospective; it seeks to forestall insolvency, not to provide recompense after it has occurred. In short, there is no basis in the language of § 17(a) for inferring that a civil cause of action for damages lay in favor of anyone. *Cort v. Ash*, 422 U.S., at 79, 95 S.Ct., at 1088.

442 U.S. at 569–71, 99 S.Ct. at 2486 (footnote omitted). The Court found no evidence to the contrary in the legislative history of section 17(a), or any other provision of the Exchange Act. In fact, the Court observed that "when Congress wished to provide a private damage remedy, it knew how to do so and did so expressly," *id.* at 572, 99 S.Ct. at 2487, citing the provisions of sections 9, 16(b), and 18(a) of the Exchange Act, 15 U.S.C. §§ 78i(e), 78p(b), and 78r(a), and that "[t]here is evidence [in the legislative history] to support the view that § 18(a) was intended to provide the exclusive remedy for misstatements contained in *any* reports filed with the Commission, including those filed pursuant to § 17(a)." *Id.* at 573–4, 99 S.Ct. at 2488 (footnote omitted, emphasis added).

Section 13(d) is identical to section 17(a) in that it "neither confers rights on private parties nor proscribes any conduct as unlawful." *Id.* at 569, 99 S.Ct. at 2486. It simply requires persons acquiring a substantial interest in a firm to report their acquisition to the Commission, the exchanges, and the issuer. Like section 17(a), there is no basis in the statute's language for implying a private right of action in anyone, and, like section 17(a), section 13(d)'s legislative history contains no suggestion that Congress intended such a right of action.

For purposes of *Cort v. Ash* intent analysis the only significant difference between the two statutes, as the plaintiffs have applied them in *Touche Ross* and in this case, is that, here, the issuer received a copy of the SEC filing, while in *Touche Ross* the plaintiff trustee's customer bene-

ficiaries did not.[40] This difference, however, does not detract from the analogy we have drawn between the two cases. *Touche Ross* is strong precedent for the view that Congress did not intend the sort of claim Liberty has brought.

There are still other reasons why we conclude that Congress harbored no such intent. In addition to the enforcement mechanisms Congress expressly provided in sections 9, 16(b) and 18(a), it provided in section 21 of the Exchange Act, 15 U.S.C. § 78u (1982), an express method of enforcing the provisions of section 13(d). Section 21 authorizes the Commission to investigate the possible violation of any provision of the Act. It empowers the Commission to bring suit in federal court against any suspected, or expected, violator, and authorizes it to forward any evidence of a violation to the Attorney General for the commencement of criminal proceedings at his discretion. 15 U.S.C. § 78u (1982). The Supreme Court in *Transamerica* found that where a statutory scheme provides explicit remedies "a court must be chary of reading others into it." 444 U.S. at 21, 100 S.Ct. at 247. In light of these extensive and varied enforcement mechanisms it cannot be argued that Congress failed to direct its attention to the problem of enforcing section 13(d).[41] Rather, the more per-

suasive inference is that Congress did not intend to supplement Commission and shareholder enforcement of the statute with the issuer remedy Liberty has proposed in this case.

Congressional intent not to imply the right of action Liberty has brought is also made apparent when one focuses on the particular injunctive remedy Liberty seeks; it is both inappropriate and lacking in proportion to the wrong alleged.[42] Section 13(d) creates an affirmative duty in a person after he has acquired more than five percent of the shares of an issuer to file a form for purely informational purposes. It strikes us that the obvious antidote for an allegedly false filing is a corrected filing. Yet Liberty does not request such a remedy. Instead, it seeks to force a major stockholder to unload its vast holdings and to lose its voting power over the shares it owns. The primary effect of such relief, if granted, would be to lower the market price of Liberty shares, which plainly would not be beneficial to shareholders. This result would be plainly contrary to congressional intent in adopting the Williams Act.

Under the second prong of *Cort*, then, we conclude from the statutory language, the contextual setting, the Supreme Court's

**40.** Although the issuer is likely to know that a buyer has acquired more than 5% of its outstanding shares and must therefore file a schedule 13D statement, there is no reason to believe that issuers are particularly knowledgeable of the substantive information that should be contained in those statements. That information concerns the purchaser and his intentions rather than the issuer. Therefore, an argument cannot be made that the issuer is uniquely well situated to enforce section 13(d) based on its superior ability to detect falsehoods. Even the failure to file a schedule 13D statement, a fact which issuers are perhaps particularly well placed to know, does not argue for issuer enforcement. All the information required for SEC enforcement of section 13(d) could be contained in a letter from the issuer to the Commission, thereby avoiding the dangers of vexatious litigation inherent in the creation of an issuer cause of action.

**41.** The Exchange Act provides for private rights of action expressly in several other places. Sec-

tion 9(e), 15 U.S.C. § 78i(e) (1982), provides for a private right of action on behalf of purchasers and sellers who are injured as a result of an illegal price manipulation. Section 16(b), 15 U.S.C. § 78p(b) (1982), creates a private right of action on behalf of the issuer to recover funds from the trading of certain insiders. We may infer from this that when it chose to do so, Congress knew how to create explicitly a private right of action on behalf of the issuer.

**42.** Liberty is far from unique as an issuer in seeking such relief in a suit for violation of section 13(d). *See, e.g., GAF Corp. v. Milstein*, 453 F.2d at 714 ("requested that the Milsteins be permanently enjoined from ... (3) voting any shares of GAF stock acquired during the conspiracy"); *Missouri Portland Cement Co. v. H.K. Porter Co.*, 535 F.2d at 391 ("that any shares acquired by Porter ... should be divested; or that Porter should be enjoined form voting such shares"); *General Aircraft Corp. v. Lampert*, 556 F.2d at 93 ("enjoining appellant from ... (4) voting any GAC stock").

interpretation of subsidiary questions, and the relationship between the alleged wrong and the relief requested in this case that there was no clear legislative intent to imply an issuer right of action to obtain the ouster of a shareholder who has made a false schedule 13D filing.

The final *Cort* inquiry, and the one we think dispositive of the question before us is whether the private remedy Liberty seeks is consistent with the underlying purpose of the legislative scheme. We are convinced that it is not.

The Williams Act dealt mainly with tender offers. It is clear from the legislative history that the framers of the Williams Act sought to "take extreme care to avoid tipping the balance of regulation either in favor of management or in favor of the person making the takeover bid," and that their goal was to promote "full and fair disclosure for the benefit of investors while at the same time providing the offeror and management equal opportunity to present their case." S.Rep. No. 550 at 3. To give Liberty the relief it asks would defeat this purpose. When an outsider acquires a large amount of stock in a publicly held company this creates at the very least a nascent potential conflict between the outsider and management. To permit the issuer to oust the new stockholder simply because he made a false filing would tip the balance towards management, thereby injuring the existing investors. Moreover, incumbent management could solidify its position by subjecting to suit any outsider who accumulated more than 5% of the shares of the company, and thus discourage such accumulations. The threat of this sort of litigation might remove from the field a player whose self-interest is to monitor management, and who is poised to mount a proxy fight or a tender offer.

Ever since Berle & Means' seminal work, The Modern Corporation and Private Property (1933), it has been generally recognized that small shareholders in large publicly held companies have an insufficient incentive adequately to monitor the management of the firm. Nevertheless, these shareholders are not bereft of all relief from improper or inefficient management. Large shareholders, or outsiders who may challenge incumbent management, help protect the small shareholders' interest in monitoring—by possibly challenging—incumbent management. The more obstacles that are placed in the path of those who would acquire large holdings, and the more expensive and time consuming the take over process becomes, the less protection for the small shareholder.

The inappropriateness of implying the remedy Liberty seeks is illustrated by an examination of the consequences that remedy would visit on existing shareholders. While section 13(d) is intended to ensure the provision of information to the market through the Commission, the exchanges and management, and it is the investors who are the intended beneficiaries of this legislation, the relief requested by the issuer, here, is at best ambiguous, even in its immediate effect on the shareholders. Requiring that Charter divest itself of Liberty shares, by selling them back to non-parties or on the open market, will depress the price, by increasing the supply of Liberty stock on the market without a corresponding increase in the demand. Removing voting power from Charter will have the effect of removing outside monitoring of management by a shareholder with significant financial interest in policing management. Thus, the divestiture remedy sought by the "issuer" illustrates only too well that the interests of shareholders and management are not likely to be identical with regard to policing schedule 13D filings.

While there is a sense in which management acting through the issuer can efficiently reflect the collective interests of the stockholders, this does not hold true when the interests of the stockholders and management are adverse to one another.[43]

---

**43.** Section 13(e) of the Williams Act, 15 U.S.C. § 78m(e) (1982), provides authority for the SEC to require the issuer to comply with reporting requirements similar to those imposed on outsiders under section 13(d). This demonstrates a clear recognition on the part of Congress that

When an outsider is perceived as threatening to displace the insiders, management has a clear economic interest in protecting its position, even though this might not be in the economic interest of the firm or its shareholders. The creation of a private right of action on behalf of the firm would allow incumbent management to use corporate resources, rather than their own, to harass and burden aggressive outsiders. Moreover, it would be difficult for the outsider to avoid vexatious litigation by any manner of careful craftsmanship in his filing; all the incumbent management would have to demonstrate to maintain its claim for relief would be that the outsider's schedule 13D statement of his intentions with respect to the issuer was false or misleading. Whether the outsider is unequivocal or equivocates as to his intentions, the issuer could simply allege, as Liberty did in this case, that his true intentions are the opposite. As Judge Friendly pointed out in one of the first cases to construe the Williams Act, "It would be as serious an infringement of these regulations [for the outsider] to overstate the definiteness of [its] plans as to understate them." *Electronic Specialty Co. v. International Controls Corp.*, 409 F.2d 937, 948 (2d Cir.1969).

Measuring the truthfulness of a filing could pose significant problems for a district court as well. The court might find it difficult, even after an extensive evidentiary proceeding, to determine the subjective intentions of the party filing the schedule 13D statement at the time it filed it. And once the court made its determination it might have difficulty withdrawing from the dispute. Having entered a coercive order, enforceable through the court's contempt power, requiring the party to amend its schedule 13D, the court could be faced with still further proceedings. For example, the

issuer might find fault with the party's schedule 13D amendment and move the court to issue an order requiring the party to show cause why it should not be held in contempt for filing an inadequate amendment. If the show cause order issued, the court would once again be required to find the party's intent, and the process of an amended filing and a new show cause proceeding might well begin anew.

A final concern to us is the precedential effect a divestiture order in this case would have on the market for securities generally. Parties contemplating the acquisition of large holdings in publicly traded companies would be faced with substantial transaction costs in the form of section 13(d) litigation expenses, including delay, whenever perceived by incumbent management as a threat to their economic welfare. The chilling effect of the remedy Liberty would have us approve could have a deleterious impact on the market for corporate control and the value of securities generally. We therefore agree with the district court that no cause of action under section 13(d) exists for the relief Liberty requests.[44]

## IV.

Liberty's second claim for relief, though stated as one claim, actually presents two discrete causes of action, each seeking the same relief: that Charter be required to divest itself of its Liberty holdings and pending such divestiture enjoined from voting any of its shares. Liberty's first cause of action is that Charter made a tender offer without complying with the filing requirements of section 14(d) of the Exchange Act; it neglected to submit an information statement to the SEC. Liberty's second cause of action is that Charter in making the tender offer committed certain fraudulent acts in violation of section 14(e)

---

the interests of management acting through the issuer might be adverse and detrimental to the best interest of the shareholders.

**44.** The district court limited its holding to finding no standing (cause of action) on behalf of the issuer to challenge a facially sufficient 13D filing, such as the one involved in this case. *See*

*supra* note 19. The court left open the question of whether Liberty could have sued Charter had Charter failed to file a schedule 13D. *See Rondeau, supra* text at 20–21. We find no compelling basis under our *Cort* analysis to distinguish the two situations.

of the Act; it filed a false schedule 13D statement. Liberty does not inform us how either of these statutory violations injured Liberty or why Congress intended that the relief it seeks be a means of enforcing these two laws.

Section 14(d) requires that persons making a tender offer for securities disclose certain prescribed information by filing it with the Commission and the issuer, and section 14(e) prohibits fraudulent conduct in connection with such a tender offer. Liberty must surmount two hurdles before it can recover under either of these two sections. First, Liberty must demonstrate that an implied right of action exists on behalf of an issuer for the type of injunctive relief sought. Second, Liberty must have alleged sufficient facts to permit a court to infer that Charter conducted a tender offer. We conclude that the right of action Liberty asserts cannot be implied under either section. Accordingly, we need not determine whether Charter made a tender offer.

Sections 14(d) and (e) do not by their language create private rights of action. The existence of and limits on the right to bring a private cause of action are, as we have stated, of judicial origin. The question of whether, and when, an issuer can bring an action under sections 14(d) and (e) is similar to that under section 13(d), in that all of these sections were incorporated into the Exchange Act by the Williams Act and were attempts to protect the same group, investors, and address similar problems. Therefore, our analysis will cover much the same ground we addressed in part III, *supra*. Nonetheless, there are some facial differences between these sections which must be discussed.

The Supreme Court addressed the existence and limits on private rights of action under sections 14(d) and (e) in *Piper v. Chris-Craft Industries, Inc.*, 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977). *Piper*, while not on all fours with the case before us, is nevertheless extremely useful for achieving a proper understanding of implied rights of action under sections 14(d) and (e). Chris-Craft was an unsuccessful tender offeror who sought damages against the management of the company it sought to take over, Piper, Piper's investment adviser, and Bangor Punta Corporation, the successful "white knight" [45] that defeated Chris-Craft in its bid for control of Piper. The Supreme Court held that since the purpose of the Williams Act was to provide protection for shareholders and not for tender offerors, no implied cause of action would lie for a defeated tender offeror.[46]

The Court specifically stated:

Our holding is a limited one, whether shareholder-offerees, the class protected by § 14(e), have an implied cause of action under § 14(e) is not before us, and we intimate no view on the matter. *Nor is the target corporation's standing to sue in issue in this case.* We hold only that a tender offeror, suing in its capacity as a takeover bidder, does not have standing to sue for damages under § 14(e).

*Id.* at 42 n. 28, 97 S.Ct. at 949 n. 28 (emphasis added). In view of those words of limitation supplied by the High Court, it would be unseemly to attempt to read a hidden meaning into the Court's holding that was not its voiced intent. With that caution in mind, we must nonetheless make

---

**45.** "White Knight" is a term used to describe a tender offeror friendly to management that attempts to defeat a hostile tender offeror.

**46.** Though the ostensible purpose of the Williams Act is the protection of investors, a number of commentators have had difficulty in determining what, if any, underlying remedial purpose is actually being served by the Act. *See*, Manne, *Tender Offers and the Free Market*, 2 Merger & Acq. 91 (No. 1, Fall 1966); Manne, *Salute to "Raiders"*, Barron's 1 (Oct. 23, 1967);

Manne, *Cash Tender Offers for Shares—A Reply to Chairman Cohen*, 1967 Duke L.J. 231; Jarrell & Bradley, *The Economic Effects of Federal and State Regulation of Cash Tender Offers*, 23 J. of Law and Econ. 371 (1980); *Separate Statement of Frank H. Easterbrook and Gregg A. Jarrell*, S.E.C. advisory committee on Tender Offers: Report of Recommendations p. 70 (July 8, 1983), Federal Sec.Rep. (C.C.H.) special report no. 1028 (July 15, 1983).

proper use of the reasoning provided by the Court to determine whether the law requires that we find that Congress has implied a cause of action on behalf of issuers under sections 14(d) and (e).

In *Piper*, the Court refined the test it had outlined in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), for determining whether a private remedy is to be found implied in a statute which did not explicitly grant one. *Piper* is fundamentally concerned with legislative intent; which apparently is the focus of the *Cort v. Ash* inquiry. *Touche Ross*, 442 U.S. at 575, 99 S.Ct. at 2489; *Transamerica*, 444 U.S. at 15–16, 100 S.Ct. at 245. As our earlier discussion of section 13(d) makes clear, the purpose of the Williams Act as a whole, and the tender offer provisions in particular, is to provide protection to investors.[47] We must determine, then, by asking the *Cort v. Ash* questions, whether creating a cause of action on behalf of the issuer to seek equitable relief in the form of expelling a tender offeror from the company was the intention of the framers of sections 14(d) and (e).

As was the case in our analysis of Liberty's sections 10(b) and 13(d) claims, here too we begin with *Cort's* fourth prong, i.e., whether Liberty presents a cause of action traditionally relegated to state law. While the response to this question may be informative, it is least likely to be dispositive of the issue of congressional intent. The tender offer provisions of the Williams Act were intended to dominate the field. *Edgar v. Mite Corp.*, 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982). It is therefore not inappropriate that a cause of action be implied under federal law as distinct from state law. This, however, is merely the lack of a negative inference to be drawn from the existence of a state law remedy, and not a positive argument in favor of discovering an implied federal remedy.

Under the first prong of *Cort*, we must reach the same conclusion that we did with respect to section 13(d); the purpose of the Williams Act was to benefit investors. *Piper*, 430 U.S. at 35, 97 S.Ct. at 946. Issuers are not the class for whose especial benefit sections 14(d) and (e) were enacted.

The second prong of *Cort* asks whether there was either explicit or implicit intent to create this remedy for this party. Unlike our treatment of section 13(d) we need not engage in the *Curran* analysis of whether Congress had comprehensively amended these sections in the face of "routine and consistent" recognition by the courts of an implied issuer cause of action to divest a shareholder. Sections 14(d) and (e) were enacted in 1968 and have only been amended once since, in 1970. As we said before, the two-year period between 1968 and 1970 is insufficient for any judicial construction of a statute to rise to the level of being "routine and consistent." We thus repair to the texts of sections 14(d) and (e) and the legislative history to divine congressional intent.

The texts of sections 14(d) and (e) give no indication that Congress intended to imply

**47.** Though it is shareholders and particularly the shareholders of target corporations who are the intended beneficiaries of the disclosure requirements under section 14(d), there are a number of paradoxes in the reasoning process that undergirds the Williams Act, which make it difficult to see how shareholder interests are served. We will only mention one peculiar anomaly. If the offeror's statement under section 14(d) indicates that its plans for the company should raise the value of the shares considerably, the small shareholder, knowing that his decision to tender or not will have a de minimus effect on the probability of the success of the tender offer, will have an incentive not to tender so as to gain the benefits of the new regime. On the other hand, if the offeror indicates that he will turn over the reigns of the company to incompetents, the shareholder will have a greater incentive to tender, so as not to suffer a loss of value following the change to the new regime. Thus, paradoxically, the more information that is given by the offeror, the less likely that tender offers that would increase value will be successful, and the more likely that those that would decrease value will be successful. Therefore, non-tendering shareholders will be damaged by control moving to, or staying in, those hands less likely to increase the value of the firm. This is a curious result for a piece of legislation that is intended to help shareholders. *See* Cohen, *Tender Offers and Takeover Bids*, 23 Bus.Law 611, 614–615 (1968).

the sort of action that Liberty presses. The legislative history, as far as we can determine, is silent on the issue; the parties point us to nothing in the legislative process that spoke to the subject. Nor do the other provisions of the Exchange Act indicate the answer. It is true that section 18(a) of the Act provides a cause of action, at law or in equity, for purchasers and sellers injured by false or misleading statements in documents required to be filed with the Commission. While this gives some support for the argument that Congress did not intend to provide an additional private remedy, it does not carry the dispositive weight that it did in our analysis of section 13(d). Sections 14(d) and (e) place a variety of other obligations on a party in addition to filing documents. Therefore, since section 18(a) would not provide any remedy for wrongs committed in fulfilling those obligations, it is possible that Congress did intend additional private remedies to supplement the Commission's broad enforcement powers under the Exchange Act. *See* 15 U.S.C. § 78u (1982). In sum, the second prong of *Cort v. Ash* yields no definitive result.

The third prong of *Cort* asks whether implying the cause of action presented is consistent with the underlying purpose of the legislation. Our analysis of this question is virtually identical to the one we conducted in part III with regard to section 13(d). Rather than reiterate those arguments we confine our discussion to the few minor differences in the purposes of sections 14(d) and (e) and section 13(d).

First, we note that sections 14(d) and (e) deal specifically with tender offers, rather than mere accumulations of stock as does section 13(d). Since it is tender offers with which the Williams Act is primarily concerned, the congressional admonitions with regard to the even-handed treatment to be given tender offerors and incumbent management have even greater force with respect to sections 14(d) and (e) than they do with respect to section 13(d).

Second, sections 14(d) and (e) are formally part of 15 U.S.C. § 78n (1982), entitled "Proxies." Section 14(a) of this title, enacted in 1934, provides an implied private cause of action for individuals to challenge proxy contests. *J.I. Case Co. v. Borak*, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). The introductory language of section 14(d) is virtually identical to that of section 14(a). Both sections begin with these words: "It shall be unlawful for any person ... by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise ..." The identical nature of the introductory language and the fact that sections 14(d) and (e) appear under the same title as section 14(a), combined with the fact that the Supreme Court has found an implied private right of action under section 14(a), lends, at first blush, support to the finding that an implied issuer right of action to expel an unwanted tender offeror is consistent with the congressional scheme.

There are three substantial reasons for rejecting such a finding, however. First, the mere use of the same introductory boilerplate language cannot compel us to treat sections 14(a) and (d) identically. Second, we do not here decide the question of the existence of *any* private right of action under sections 14(d) and (e), only the issuer's right to bring such a claim.

Finally and most importantly, the Supreme Court, without overruling *Borak*, appears to have limited its holding to its facts. In *Touche Ross* the Court stated, "[w]e do not now question the actual holding of [Borak], but we decline to read the opinion so broadly that virtually every provision of the securities Acts gives rise to an implied private cause of action. *E.g., Piper v. Chris-Craft Industries, Inc.*" 442 U.S. at 577, 99 S.Ct. at 2490. *Piper*, like the case before us, involved sections 14(d) and (e) and did not recognize an implied right of action; therefore, by citing *Piper* it is apparent that the High Court in *Touche Ross* did not believe that the *Borak* rationale extends to these two sections.

■ In summary, just as we found under section 13(d), an issuer right of action un-

der sections 14(d) and (e) is (1) not mandated by the legislative history, and in fact is inconsistent with the even-handedness called for; (2) would not serve the interests of those for whose especial benefit this legislation was enacted, shareholders; and (3) would not be consistent with the underlying purpose of the legislation in that it would lead to vexatious litigation by entrenched management, employing the issuer's resources, to fend off presumed hostile takeover attempts. We hold, therefore, that Liberty was not entitled to maintain its second claim.

## V.

None of Liberty's three claims stated a cause of action. Each claim should have been dismissed with prejudice but was not. Charter has not cross-appealed the court's "without prejudice" disposition, however. Accordingly, for the reasons we have stated the judgment of the district court is

AFFIRMED.

VANCE, Circuit Judge, concurring in part and dissenting in part:

I join the majority's opinion with respect to section 10(b). The precepts of *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982), however, compel me to conclude that implied causes of action exist under sections 13(d), 14(d) and 14(e) that permit Liberty to seek injunctive relief.

Divining the collective intent of a body of lawmakers is a task fraught with difficulty, and it is this task that divides the court. In my view, the majority's resolution of Liberty's claims under the Williams Act places undue emphasis on *Cort v. Ash.* By lending each of the *Cort* factors nearly equal weight, my colleagues embrace precisely the mechanical application of *Cort* that the Supreme Court rejected in *Touche Ross & Co. v. Redington*, 442 U.S. 560, 575–76, 99 S.Ct. 2479, 2488–89, 61 L.Ed.2d 82 (1979). *See California v. Sierra Club*, 451 U.S. 287, 302, 101 S.Ct. 1775, 1783, 68 L.Ed.2d 101 (1981) (Rehnquist, J., concurring). In the years since *Cort* the Supreme

Court has emphasized that congressional intent is the touchstone of any claim of implied private right. *Curran*, 456 U.S. at 377–78, 102 S.Ct. at 1838–39; *Touche Ross*, 442 U.S. at 568, 99 S.Ct. at 2485. An examination of the intent behind section 13(d), under the guidance of *Curran*, is dispositive of claims under that provision as well as under sections 14(d) and 14(e).

A critical guidepost in discerning legislative intent is "Congress' perception of the law that it was shaping or reshaping." *Curran*, 456 U.S. at 377–78, 102 S.Ct. at 1838–39; *see also Herman & MacLean v. Huddleston*, 459 U.S. 375, 103 S.Ct. 683, 689, 74 L.Ed.2d 548 (1983). Thus in *Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), the Supreme Court, in recognizing a private remedy under Title IX of the Education Amendments of 1972, stressed that Title IX was modeled on Title VI of the Civil Rights Act of 1964 and was enacted at a time when Title VI had been construed as creating a private remedy. *Id.* at 694–703, 99 S.Ct. at 1956–1960.

In *Curran*, the Court expounded upon the significance of the contemporary legal context surrounding a statute's enactment:

"Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change...."

456 U.S. at 382 n. 66, 102 S.Ct. at 1841 n. 66 (quoting *Lorillard v. Pons*, 434 U.S. 575, 580, 98 S.Ct. 866, 870, 55 L.Ed.2d 40 (1978)).

In determining whether a private cause of action is implicit in a federal statutory scheme when the statute by its terms is silent on that issue, the initial focus must be on the state of the law at the time the legislation was enacted.... When Congress enacts new legislation, the question is whether Congress intended to create a private remedy as a supplement to the express enforcement provisions of the statute. When Congress acts in a statutory context in which an implied private remedy has already been

recognized by the courts ... the inquiry logically is different. Congress need not have intended to create a new remedy, since one already existed; the question is whether Congress intended to preserve the pre-existing remedy.

456 U.S. at 378–79, 102 S.Ct. at 1839. Accordingly, the *Curran* Court viewed the comprehensive 1974 amendment of the Commodity Exchange Act (CEA),[1] which did not expressly displace the unanimous case law implying a private action for damages, as proof that Congress positively intended to retain the judicially implied remedy. Once it resolved the question of legislative intent, the *Curran* Court perceived no need to dwell upon the remaining *Cort* factors. *Id.* at 388, 102 S.Ct. at 1844.

The evidence that Congress approved of implied relief under the Williams Act is unusually strong because it combines the indicia relied on by the Supreme Court in *Cannon* and *Curran*. Congress enacted the Williams Act and twice amended section 13(d) in a legal climate in which implied remedies had already been recognized. The majority ignores the fact that the Williams Act was cast upon the statute and regulations governing proxy solicitations, chiefly section 14(a) of the Securities Exchange Act, 15 U.S.C. § 78n(a) (the 1934

Act).[2] H.R.Rep. No. 1711, 90th Cong., 2d Sess. 3–4 (1968), U.S.Code Cong. & Admin. News 1968, p. 2811; S.Rep. No. 550, 90th Cong., 1st Sess. 2–5 (1967). On the Senate floor, Senator Williams explained:

What this bill would do is to provide the same kind of disclosure requirements which now exist, for example, in contests through proxies for controlling ownership in a company.

. . . . .

[It] is patterned on the present law and the regulations which govern proxy contests.

113 Cong.Rec. 24,665 (1967).

The significance of this lineage lies in *J.I. Case Co. v. Borak*, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964), decided four years before the passage of the Williams Act. In *Borak* the Supreme Court construed section 14(a) to allow a shareholder to sue for damages on behalf of the corporation to redress injuries from false and misleading proxy solicitation materials distributed in violation of that provision. Given the Williams Act's origin in section 14(a), *Borak* gave Congress ample reason to assume that the federal judiciary would imply private rights of action to enforce the newly enacted mandates.[3] *See Curran*,

---

1. 7 U.S.C. § 1 et seq.

2. Section 14(a) provides:

 It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78*l* of this title.

 Under Commission rules promulgated pursuant to section 14(a), *see* 17 Fed.Reg. 11,431 (1952), participants in proxy contests must file written proxy statements informing shareholders of their identities, their shareholdings, and sources of financing. 17 C.F.R. § 240.14a–3 (1983).

 The Williams Act added sections 13(d) and 14(d), (e) and (f) to the 1934 Act. The legislative history is replete with statements that the disclosure machinery authorized by section

14(a) was the model both for sections 14(d)–(f), regulating cash tender offers, and for section 13(d), governing large-scale stock acquisitions:

 The cash tender offer is similar to a proxy contest, and the committee could find no reason to continue the present gap in the Federal securities laws which leaves the cash tender offer exempt from disclosure provisions. . . .

 The bill would correct the current gap in our securities laws by amending the Securities Exchange Act of 1934 to provide for full disclosure in connection with cash tender offers *and other techniques for accumulating large blocks of equity securities of publicly held companies.*

H.R.Rep. No. 1711, 90th Cong., 2d Sess. 3–4 (1968) (emphasis added), U.S.Code Cong. & Admin.News 1968, p. 2813.

3. Congress is presumed to be familiar with the judicial decisions interpreting the provisions upon which a new enactment is modeled. *Curran*, 456 U.S. at 382 n. 66, 102 S.Ct. at 1841 n. 66. In this instance there also exists evidence that committee witnesses brought *Borak* to the

456 U.S. at 379, 382 n. 66, 102 S.Ct. at 1839, 1841 n. 66; *Cannon,* 441 U.S. at 694–703, 99 S.Ct. at 1956–1960.

The courts did not refute that notion. To the extent that issues preliminary to the merits were litigated before the courts, the outstanding question was not whether a private remedy existed, but rather who would have standing to sue. *See, e.g., General Aircraft Corp. v. Lampert,* 556 F.2d 90, 94–95 (1st Cir.1977) (section 13(d)); *GAF Corp. v. Milstein,* 453 F.2d 709, 719 (2d Cir.1971), *cert. denied,* 406 U.S. 910, 92 S.Ct. 1610, 31 L.Ed.2d 821 (1972) (section 13(d)); *Electronic Specialty Co. v. International Controls Corp.,* 409 F.2d 937, 946 (2d Cir.1969) (sections 14(d) and 14(e)). In the three years Congress spent deliberating the 1977 amendments to section 13(d), unanimous authority granting standing to issuers continued to mount [4] and *Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975), was decided.

In reading *Rondeau* to cast doubt on the existence of a private remedy under section 13(d), the majority takes too crabbed a view of that case. Two remarks are in order. First, it is important to note that *Rondeau* was decided on the same day as *Cort v. Ash.* Justice Brennan, who wrote for a unanimous majority in *Cort,* explicitly stated in *Rondeau* that he read the Williams Act to authorize injunctive relief to issuers. *Id.* at 65, 95 S.Ct. at 2079 (Brennan, J., dissenting). He wrote to register his dissent precisely because he felt an injunction should have issued, a result that necessarily assumed the existence of a cause of action.

More importantly, what matters is not what *Rondeau* held but the impression it gave to Congress. *Curran,* 456 U.S. at 378 n. 61, 102 S.Ct. at 1839 n. 61. *Curran* contains an instructive parallel. In *Chicago Mercantile Exchange v. Deaktor,* 414 U.S. 113, 94 S.Ct. 466, 38 L.Ed.2d 344 (1975), the Supreme Court conferred the Commodity Exchange Commission with primary jurisdiction over private actions to enforce the CEA. The *Curran* Court subsequently characterized *Deaktor* as having "simply assumed" that the CEA afforded an implied right of action. 456 U.S. at 380–81 & 381 n. 65, 102 S.Ct. at 1840–41 & 1841 n. 65. Because *Deaktor* left the impression that an implied cause of action no longer was in question, the *Curran* Court viewed the case as part of the legal backdrop to the 1974 CEA amendments. *Id.* at 381, 102 S.Ct. at 1841. In the case of *Rondeau,* its discussion of the prerequisites of relief and its coincidence with *Cort v. Ash* only strengthened the assuring impression it gave.

Indeed, my colleagues elsewhere concede that lower court cases which simply assume an implied right of action "speak[ ]... strongly to the routine and consistent quality" of the case law. While they agree that a "plethora" of such cases supports relief under section 13(d), they refrain from lending dispositive weight to Congress' silence in the face of this authority because in their view the focus of the 1977 amendments was too narrow, in contrast with the comprehensive reenactment in *Curran,* to ensure that Congress considered the question.

I take issue with the majority's view both of the 1977 amendments and of *Curran.* The legislative history of the 1977 amendments reveals that Congress' main concern was not with foreign investors but rather with the use of financial intermediaries and nominee accounts to cloak the true identity of owners, both foreign and domestic. *See generally* S.Rep. No. 114, 95th Cong., 1st Sess. 4–7, 12–15 (1977), *reprinted in* 1977 U.S.Code Cong. & Ad.News 4102–04, 4110–13. For this reason Congress amended section 13(d) to require disclosure of information concerning beneficial ownership inter-

---

attention of the drafters of the Williams Act. Hearings before the Subcommittee on Securities of the Senate Committee on Banking and Currency on S. 510, 90th Cong., 1st Sess. 67, 140 (1967) (testimony of Profs. Israels and Painter).

4. See the majority opinion, 734 F.2d at 562 n. 37.

ests.[5] This change, coupled with others extending the reach of section 13(d) and mandating a centralized databank for purposes of consolidating ownership information, bespeaks a clear intent to strengthen the overall regulatory scheme consistent with a private right of enforcement. *Cf. Curran*, 456 U.S. at 394, 102 S.Ct. at 1847.

Likewise, nothing in *Curran* precludes us from giving congressional action in the face of judicially implied relief dispositive weight despite the fact that Congress did not debate the merits of private relief in the course of the deliberations over the 1977 amendments. *Cf. Northwest Airlines, Inc. v. Transport Workers Union*, 451 U.S. 77, 94, 101 S.Ct. 1571, 1582, 67 L.Ed.2d 750 (1981). In fact, in *Herman & MacLean v. Huddleston*, 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983), the Supreme Court unanimously held that the 1975 amendments to the 1934 Act effectively ratified the ample authority affirming the cumulative nature of the section 10(b) action. It reached this result, citing *Curran*, without referring to any debates on the issue, even though the amendments themselves neither addressed nor changed section 10(b). *Huddleston* thus suggests a flexible approach in which a substantial remedial amendment in the face of extensive case law unanimously affording a private remedy can substitute for a more direct expression of congressional intent.

In certain respects the claim to an implied cause of action under section 13(d) is even stronger than the parallel claim in *Curran*. The Williams Act, unlike the CEA, was originally enacted in a judicial climate favoring implied causes of action, and it was patterned after the very provision that *Borak* had previously endowed with a private remedy. Not even the CEA in *Curran* could lay claim to such ancestry. There was no pressing need, given *Borak* and *Rondeau*, for Congress to reexamine the case law establishing issuer redress, and it twice passed up the opportunity to do so.[6] For these reasons I am convinced that we are obliged to follow *Curran*.

In resolving the question of legislative intent, several considerations recommend against the majority's resort to *Touche Ross & Co. v. Redington*, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979). First, that case, decided in 1979, has no bearing on the state of the law as Congress perceived it in 1968, 1970 or 1977.[7] Furthermore, the *Touche Ross* Court noted that section 17(a), the provision at issue, had no history of long-standing lower court interpretation. *Id.* at 577 n. 19, 99 S.Ct. at 2490 n. 19. After *Cannon* and *Curran*, that distinction became highly relevant, if not dispositive. We are bound to follow *Curran*, the later case, to the extent that its method of elucidating legislative intent dif-

---

5. The committee observed that the disclosure of beneficial interests was necessary to combat several evils:

> While there are sound reasons for use of street and nominee names to facilitate securities transactions, their widespread use raises a numbers [sic] of problems both for investors and for the formulation of public policy. For one thing, street name and nominee accounts impose one or more layers between the issuer and the beneficial owner thereby making issuer-shareholder communications more difficult and expensive. For another reason, street name and nominee accounts impede public access to information regarding the control of publicly held corporations and make it possible for power and influence to be exercised with relative anonymity.

*Id.* at 5, *reprinted in* 1977 U.S.Code Cong. & Ad.News 4102–03. The Senate Report contains an extensive discussion of the street name loophole but it expresses concern for increased for-

eign control of domestic corporations per se only in passing.

6. *Cf. Andrus v. Allard*, 444 U.S. 51, 57, 100 S.Ct. 318, 323, 62 L.Ed.2d 210 (1979) ("[I]t is particularly relevant that Congress ... twice reviewed and amended the statute without rejecting" an established precedent).

7. In footnote 35, the majority suggests a definition of the contemporary legal context of a statute that would require Congress to peer into a crystal ball and predict *Touche Ross* and other developments in the law. Such a definition, if adopted, would wholly distort the meaning of *Curran*. In portraying the legal context of the CEA, the Supreme Court restricted its discussion to the routine and consistent *prior* authority approving an implied cause of action under that Act, and under that Act alone. 456 U.S. at 378–82, 102 S.Ct. at 1839–41.

fers from *Touche Ross*. Importantly, *Touche Ross* involved a claim for money damages rather than for injunctive relief.[8] Finally, an analogy to *Touche Ross* is no substitute for a direct examination of the origins of the Williams Act.[9]

" 'It is just as much "judicial legislation" for a court to withdraw a remedy which Congress expected to be continued as to improvise one that Congress never had in mind.' " *Curran*, 456 U.S. at 394 n. 100, 102 S.Ct. at 1847 n. 100 (quoting *Leist v. Simplot*, 638 F.2d 283, 313 (2d Cir.1980)). The foregoing examination, under *Cannon* and *Curran*, of the contemporary legal context surrounding the enactment and amendments of section 13(d) reveals that Congress intended to create a private right of action. This examination complete, the majority's argument that issuers fall outside the class for whose special benefit section 13(d) was enacted lapses into irrelevance. "[T]here is no need for us to 'trudge through all four of the [*Cort*] factors when the dispositive question of legislative intent has been resolved.' " *Curran*, 456 U.S. at 388, 102 S.Ct. at 1844 (quoting *California v. Sierra Club*, 451 U.S. at 302, 101 S.Ct. at 1784 (Rehnquist, J., concurring)).

The fact that section 13(d) underwent careful reexamination and substantial amendment in 1977, while sections 14(d) and 14(e) have not received similar scrutiny since 1970, does not dictate a different conclusion as to the existence of causes of action under the latter provisions. All three sections were cut from the same bolt—section 14(a)—and all thus came into being stamped with the imprint of *Borak*. Congress' reevaluation of section 13(d) is significant because it confirmed in 1977 what was true of all three sections as of 1968, that is, that Congress expected the courts to clothe each section with the incidents of judicial relief, as the Supreme Court had done with section 14(a) in *Borak*.

The issue in this case thus devolves into one of standing because it raises the question whether Liberty, as the issuer, is properly authorized to seek an injunction for the benefit of the shareholders as a body. There is of course no question that Congress in framing the Williams Act took pains to "avoid[ ] tipping the balance of regulation either in favor of management or in favor of the person making the takeover bid." H.R.Rep. No. 1711, 90th Cong., 2d Sess. 4 (1968), U.S.Code Cong. & Admin. News 1978, p. 2813; *see also* S.Rep. No. 550, 90th Cong., 1st Sess. 3 (1967); *Rondeau*, 422 U.S. at 58–59, 95 S.Ct. at 2075–2076. But while the sole purpose of section 13(d) is to provide shareholders with

**8.** *See Piper*, 430 U.S. at 41–42, 97 S.Ct. at 949–950 (observing that preliminary injunctive relief rather than damages would better fulfill the purposes of the Williams Act); Steinberg, *The Propriety and Scope of Cumulative Remedies Under the Federal Securities Laws*, 67 Cornell L.Rev. 557, 596–97 (1982); Aranow, Einhorn & Berlstein, *Standing to Sue to Challenge Violations of the Williams Act*, 32 Bus.Law. 1755, 1763 (1977).

**9.** Nor do the Commission investigative powers vested in section 21 of the Act, 15 U.S.C. § 78u, preclude judicial implication of private relief. Only last year the Court in the context of section 10(b) observed:

We also reject application of the maxim of statutory construction, *expressio unius est exclusio alterius* .... As we stated in *SEC v. Joiner Corp.*, 320 U.S. 344, 350–351, 64 S.Ct. 120, 123, 88 L.Ed. 88 (1943), such canons "long have been subordinated to the doctrine that courts will construe the details of an act in conformity with its dominating general purpose." See generally *Silver v. New York Stock Exchange*, 373 U.S. 341, 357, 83 S.Ct. 1246, 1257, 10 L.Ed.2d 389 (1963) (favoring "an analysis which reconciles the operation of both statutory schemes with one another rather than holding one completely ousted"). We believe the maxim cannot properly be applied to a situation where the remedies redress different misconduct and where the remedial purposes of the Acts would be undermined by a presumption of exclusivity.

*Huddleston*, 459 U.S. at 387 n. 23, 103 S.Ct. at 690 n. 23. The Court made further note of section 28(a) of the 1934 Act, 15 U.S.C. § 78bb(a), which states that the express remedies of the Act are to be supplemented by "any and all" additional remedies. *Id.* at 383, 103 S.Ct. at 688.

Importantly, section 21 predates the Williams Act by thirty-four years. There is no indication that Congress in enacting the Williams Act envisioned section 21 as the sole remedy for violations of section 13(d).

the necessary information to reach informed decisions whether to sell their stock, shareholders as a practical matter lack the opportunity and the information to protect their interests. To begin with, schedule 13D statements are distributed to issuers, exchanges, and the Commission, but not to the shareholder public. 15 U.S.C. § 78m(d)(1). Furthermore, only target corporations have the familiarity with day-to-day operations to recognize inaccuracies and correct them. *Indiana National Corp. v. Rich,* 712 F.2d 1180, 1185 & n. 2 (7th Cir.1983); *GAF Corp. v. Milstein,* 453 F.2d at 719–21; Steinberg, *The Propriety and Scope of Cumulative Remedies Under the Federal Securities Laws,* 67 Cornell L.Rev. 557, 598 n. 241 (1982). In *Piper,* the Supreme Court recognized that misleading statements injure the corporation by committing deceit on the shareholders as a whole. *See* 430 U.S. at 32 n. 21, 97 S.Ct. at 944 n. 21. As the parties best able to detect misrepresentations, issuers have standing to ensure the accuracy of the offeror's filings for the benefit of the shareholder body.[10]

I close by observing that the principal effect of *Curran* is to refrain from conducting an independent judicial discourse on the proper ends of legislation and the best ways to achieve them. I would not second-guess, as the majority does, the advisability of issuer standing and injunctive relief under the cloak of *Cort v. Ash* because our role under *Curran* is to respect congressional intent as determined under the guidance of that case, whether or not policy considerations so advise. I am further satisfied that careful scrutiny of self-serving management claims and the judicious tailoring of injunctive relief can avoid most if not all of the deleterious effects the majority conjures. For these reasons I would grant Liberty standing to sue for

injunctive relief under sections 13(d), 14(d) and 14(e).

---

10. In *Rondeau,* for example, the Supreme Court assumed without deciding that injunctive relief in favor of the issuer would serve the goal of neutrality which is "directed toward … the protection of investors." *Piper,* 430 U.S. at 29, 97 S.Ct. at 943. The decision in *Piper* does not detract from *Rondeau* because *Piper*'s holding by its terms is limited to denying standing to competing offerors suing for damages under section 14(e). *Id.* at 42 n. 28, 97 S.Ct. at 949 n. 28.